UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-97 (NEB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) GOVERNMENT'S SENTENCING ) MEMORANDUM AND MOTION FOR ) UPWARD VARIANCE |
| LA VANG, | ) ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Erica H. MacDonald, United States Attorney for the District of Minnesota, and Nathan H. Nelson, Assistant United States Attorney, hereby respectfully submits its memorandum and position on sentencing and motion for upward variance from the Guidelines range.

## BACKGROUND

**A.   Offense Conduct**

At the time of the offense, victim L.B. was an 84-year old woman suffering from rheumatoid arthritis, congestive heart failure, was a breast cancer survivor, and had several joint replacements. (PSR ¶ 7). L.B. had ankle surgery in November 2017 and developed a blood infection that required a second surgery in February 2018. (PSR ¶ 7). Her doctors prescribed her various medication to help her recover from her surgeries, including potent narcotic pain relievers: oxycontin (10 mg twice per day) and oxycodone for breakthrough pain (5 mg as needed up to twice per day). (PSR ¶ 8).

Following the second surgery, Medicare authorized in-home health services for L.B., which were provided by a company called LifeSprk. (PSR ¶ 7). LifeSprk assigned

someone to L.B., and while under that person's care L.B.'s pain levels were under control, she could function, and was coherent. (PSR ¶ 7). Beginning in April 2018, however, LifeSprk assigned defendant La Vang, a registered nurse, to take over responsibility for L.B.'s care. (PSR ¶ 8). Among defendant's duties while caring for L.B. was setting up her weekly medication planner with her prescribed medications, including the oxycodone and oxycontin. (PSR ¶ 9). Defendant was also authorized to pick up L.B.'s medications from the pharmacy, and was aware when her refills were available. (PSR ¶ 9).

After just a couple visits under defendant's care, L.B. suffered a pronounced decrease in her health and ability to function. (PSR ¶ 8). L.B. was in pain all over her body, she could not sleep well, and she was lethargic, incoherent, and had no appetite. (PSR ¶¶ 8, 23). L.B.'s primary care physician also began questioning L.B. and her husband about improper use of controlled substances and raising concerns over L.B.'s prescriptions being filled at multiple pharmacies. (PSR ¶¶ 10, 23). The physician refused to prescribe L.B. any more narcotics and referred her to North Memorial's Pain Clinic. (PSR ¶ 10).

During her course of treatment at the pain clinic, L.B. provided multiple blood and urine samples, which tested negative for the presence of opiates even though L.B. had been taking what she and her family believed to her prescribed medication. (PSR ¶ 11). In approximately July 2018, L.B.'s husband contacted LifeSprk to raise concerns about the negative opiate tests, and only then learned for the first time that: (1) LifeSprk records showed that the period of care provided by the company ended on May 1, 2018, and (2) defendant was no longer employed by LifeSprk even though he had continued to visit L.B. under the auspices of being a LifeSprk employee. (PSR ¶ 12; ECF 29 ¶ 2).

L.B.'s family contacted the police. (PSR ¶ 12). Police searched L.B.'s house and found an oxycodone bottle that did not contain oxycodone as the family believed, but rather contained similar-looking loratadine (Claritin) allergy tablets. (PSR ¶ 13).

On August 2, 2018, during defendant's next planned visit to L.B.'s home, police conducted a controlled "sting" operation in which they observed and documented L.B.'s narcotic medication (now hydrocodone instead of oxycodone) both before and after defendant's visit to the home. (PSR ¶ 15). The operation revealed that, when defendant visited the home, he covertly put similar-looking acetaminophen (Tylenol) tablets into L.B.'s medication planner instead of hydrocodone. (PSR ¶ 16). Police conducted a traffic stop on defendant as he left the home and found numerous hydrocodone tablets defendant had fraudulently stolen from L.B. (PSR ¶ 15). Police also found in defendant's car several empty oxycodone bottles in L.B.'s name dated from April to June 2018 as well as empty bottles of acetaminophen and loratadine. (PSR ¶ 15).

In discussions with police officers, defendant initially falsely reported that he was working for Lifesprk. (PSR ¶ 15). Ultimately, however, defendant admitted to stealing the narcotics from L.B. on multiple occasions and replacing them with substitute tablets. (PSR ¶ 18). Defendant was initially charged in state court with theft by swindle and neglect of a vulnerable adult, and was later indicted in federal court. (PSR ¶ 19).

**B.    Procedural History**

Defendant pleaded guilty to Count 1 of the Indictment, which charges him with obtaining controlled substances by fraud in violation of 21 U.S.C. § 843(a)(1) and (d)(1). The PSR calculated a base offense level of 8 for Count 1 pursuant to USSG § 2D2.2, which

governs convictions for obtaining a controlled substance by fraud. (PSR ¶ 29). Although there are no specific offense characteristics associated with USSG § 2D2.2, Probation concurred with the parties' plea agreement that two Chapter 3 upward adjustments were applicable. (PSR ¶¶ 31-32). Specifically, the PSR found that a 2-level upward adjustment pursuant to USSG § 3A1.1(b)(1) is appropriate because defendant knew or should have known that L.B. was a vulnerable victim.[1] (PSR ¶ 31). The PSR further found that an additional 2-level upward adjustment pursuant to USSG § 3B1.3 is appropriate because defendant abused a position of public or private trust or used a special skill in a manner that significantly facilitated the commission or concealment of the offense. (PSR ¶ 32). After factoring in an adjustment for acceptance of responsibility, the PSR calculated a total offense level of 10, with a criminal history category I, resulting in an advisory Guidelines range of 6-12 months' imprisonment. (PSR ¶¶ 34-37, 43, 86). The parties do not dispute the Guidelines calculation in the PSR.

## SENTENCING POSITION

The principal issue before the Court is what constitutes a reasonable sentence in light of the factors enumerated in Title 18, United States Code, Section 3553(a). In

---

[1] In addressing the +2 level enhancement for vulnerable victim, the PSR notes only that the victim was age 84 at the time of the offense. (PSR ¶ 31). The Eighth Circuit has held, however, that courts cannot apply a "blanket assumption" that advanced age alone is sufficient to make a victim vulnerable, but instead must engage in a "fact-based" analysis. *See United States v. Vega-Iturrino*, 565 F.3d 430, 434 (8th Cir. 2009). Here, as discussed in the analysis of the § 3553(a) factors below, L.B.'s vulnerability is not based on a blanket assumption based on her age, but rather the fact that she was an 84-year old woman: (1) with multiple serious health conditions; (2) who was recovering from two recent surgeries; and (3) who was deprived (by virtue of defendant's conduct) of the palliative effect of the pain medication she was prescribed to cope with the after-effects of those surgeries.

fashioning a sentence, Section 3553(a) requires the Court to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense; the need for deterrence; the need to protect the public from further crimes of the defendant; and the need to avoid unwarranted sentencing disparities.  18 U.S.C. § 3553(a).  Based on these factors, the United States moves the Court to vary upward from the top of the Guidelines' range, and impose a sentence of 18 months' imprisonment.

The nature of defendant's offense is extremely serious, especially when viewed in context of the range of conduct criminalized by 21 U.S.C. § 843(a)(3).  Section 843(a)(3) covers all manner of obtaining controlled substances by fraud, ranging from deceiving physicians into writing prescriptions, to passing forged prescriptions at pharmacies.  What sets this case apart from many other cases under § 843(a)(3), however, are two facts.  First, is that defendant did not merely obtain potent pain killers to which he was not entitled, but that he obtained them by taking them directly out of the hands of another human being who acutely needed them.  This meant that defendant's pursuit of his own self-interest led directly to another person's suffering—a fact not accounted for by the Guidelines.  *See*, *e.g.*, *United States v. Richart*, 662 F.3d 1037, 1053 (8th Cir. 2011) (a court may vary from the Guidelines when "the Guidelines do not fully account for the nature, circumstances, and seriousness of [the defendant's] offense.").  Second, defendant did not merely steal the pills from someone who needed them, he covered up his theft using subterfuge by replacing the pills with over-the-counter Tylenol or allergy medication.  This allowed defendant to continue depriving L.B. of her needed medication for *months* without being detected, and

left L.B. and her family in search of answers as to why her health and overall condition had so precipitously declined. The months-long nature of the crime—during which L.B. was suffering—is another fact not fully accounted for in the modest Guidelines range.

The offense conduct is also particularly egregious because, in committing the crime, defendant exploited a tremendous power imbalance between L.B. (a particularly vulnerable victim) and himself (occupying a position of trust). With respect to the victim, L.B. was 84 years old when she was under the defendant's care, but it was not merely her age that made her vulnerable. L.B. suffered from serious health conditions including rheumatoid arthritis, congestive heart failure, and multiple joint replacements. She was in defendant's care because she had recently undergone surgery, experienced severe complications, and then undergone a second surgery. Her physicians had prescribed her palliative medication to cope with the after-effects of her surgeries, and her home healthcare providers were responsible to help mete out that medication. While she was actually taking her real pain medication, she was functioning well and "coherent." But once defendant began covertly replacing her pain pills with counterfeit tablets, she was in pain, lethargic, and incoherent—making her all the more dependent on (and vulnerable to) defendant.

Defendant, in contrast, occupied a position (as L.B.'s nurse) in which L.B. and her family put great trust in him. Because of his role as a nurse, L.B. and her family had every reason to expect that defendant would act in L.B.'s best interests and look out for her health and well-being. As part of that trust, L.B. and her family gave defendant access to their home, entrusted him to set up her medications, and even authorized him to receive notice when L.B.'s prescriptions were available and pick them up from the pharmacy. L.B. and

her family also entrusted defendant to return to the home outside of his normal visits on a couple of occasions based solely on defendant's representation that he had "erred in L.B.'s medication setup." (PSR ¶ 9). Instead of acting in L.B.'s best interests, however, defendant used his position of trust to serve his own interests, even knowing that meant harming the person in his case.

The end result of defendant's conduct was that L.B. suffered unnecessarily for months. As indicated in the PSR, she experienced pain all over her body and could not sleep well. She had to undergo multiple medical appointments to try to discover and manage the problem, at which she and her family were subjected to suspicion as to whether they were diverting the controlled substances. (PSR ¶¶ 10, 23). The PSR also discusses that L.B. unknowingly taking loratadine (Claritin) instead of her prescribed pills in her medication regimen could cause sedation, putting her at a higher risk of falls that are extremely dangerous to an elderly patient. (PSR ¶ 23). L.B. and her family rightfully feel "deeply affected" as a result of the defendant's conduct. (PSR ¶ 22). The government anticipates that representatives of L.B. will address the Court at the time of sentencing to explain the profound impact that defendant's conduct has had on L.B. and her family.

The government acknowledges that, in contrast to the extremely aggravating nature of the offense, the history and characteristics of the defendant are (on the whole) mitigating. Defendant is 27 years old and immigrated to the United States when he was a small child. The PSR explains that defendant grew up in an environment in which he exposed to substance abuse due to his father's addiction to opium and methamphetamine. As a result

of his father's felony drug convictions, defendant was placed in temporary foster care, in which he reports suffering physical abuse and emotional distress.

Despite an in-depth investigation of this case by law enforcement, the government also has no reason to dispute defendant's claim that he committed the present offense in order to fuel his own opiate addiction, which started when he was prescribed opiates for an injury. According to the defendant, the extent of his addiction was severe. Defendant's last legitimate opiate prescription was in 2015, and he apparently had been feeding his addiction for approximately three years by obtaining opioids through illegitimate means, beginning with stealing medication from his own mother. The scope of his addiction escalated over time, such that (at the time of his arrest) defendant was consuming up to 28 opiate pain pills a day. Unfortunately, that level of consumption means that defendant's substance abuse problem went far beyond the drugs he was obtaining from L.B. (who was prescribed only four pills a day at the time defendant began caring for her).

To his credit, defendant has apparently made strides in grappling with his addiction since his arrest. Although he violated the terms of his state court release after just two months by using marijuana and attempting subvert his drug testing by using substitute urine, he has had over 20 negative drug tests during his period of supervision by this Court. He also voluntarily admitted himself into intensive drug abuse treatment and aftercare programs, where he was quite successful and earned glowing remarks from his aftercare counselor in the discharge summary. (PSR ¶ 63).

Finally, it is worth noting that unlike many people charged with federal drug felonies, defendant has virtually no criminal history aside from a speeding ticket and a

seven-year old citation for disorderly conduct. (PSR ¶ 41). The disorderly conduct citation arises out of an altercation that occurred when defendant was only 20 years old, in which he and his brother confronted someone they believed to be bullying his sister. (PSR ¶ 41).

The government acknowledges the presence of these mitigating factors in this case. Nevertheless, the United States contends that these mitigating factors are, on the whole, substantially outweighed by the extremely serious nature of the offense, in which defendant betrayed the central tenet of his profession and harmed the very person who trusted him to provide care. Defendant acted with callous disregard to his own patient and let her suffer needlessly for months. A sentence of 18 months' imprisonment accounts for the mitigating aspects of defendant's personal history, while at the same time reflecting the seriousness of the offense, promoting respect for the law, providing just punishment for the offense, affording adequate deterrence, and protecting the public from further crimes of the defendant.

## CONCLUSION

For all the foregoing reasons, the United States respectfully recommends that the Court impose a sentence of 18 months' imprisonment.

Respectfully submitted,

Dated: November 19, 2019

ERICA H. MacDONALD
United States Attorney

*/s/ Nathan H. Nelson*

BY: NATHAN H. NELSON
Assistant U.S. Attorney
Attorney ID No. 0388713