1                UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3   -----------------------------------------------------------
                              )
   United States of America,    )  File No. 19-cr-97
4                         )        (NEB/BRT)
        Plaintiff,         )
5                         )
   vs.                   )  St. Paul, Minnesota
6                        )  November 26, 2019
   La Vang,              )  3:04 p.m.
7                        )
        Defendant.         )
8   -----------------------------------------------------------

9

10         BEFORE THE HONORABLE NANCY E. BRASEL
          UNITED STATES DISTRICT COURT JUDGE
               **(SENTENCING HEARING)**

11

12   APPEARANCES
    For the Plaintiff:        U.S. Attorney's Office
                         NATHAN NELSON, AUSA
13                        600 U.S. Courthouse
                         300 South Fourth Street
14                        Minneapolis, Minnesota 55415

15    For the Defendant:        Beito & Lengeling, PA
                         ROBERT A. LENGELING, ESQ.
16                        Suite 1050
                         310 Fourth Avenue South
17                        Minneapolis, Minnesota 55415

18    Court Reporter:           ERIN D. DROST, RMR-CRR
                         Suite 146
19                        316 North Robert Street
                         St. Paul, Minnesota 55101
20

21

22

23

24

25       Proceedings recorded by mechanical stenography;
   transcript produced by computer.

1          **P R O C E E D I N G S**

2               **IN OPEN COURT**

3      (Defendant present)

4           THE COURT:  We are on the record.  And good

5      afternoon again.

6           Madam Clerk, you may call the case.

7           THE COURTROOM DEPUTY:  United States of America v.

8      La Vang, Criminal Case No. 19-cr-97.

9           MR. NELSON:  Nathan Nelson on behalf of the United

10     States.  Good afternoon, Your Honor.

11          THE COURT:  Good afternoon.

12          MR. LENGELING:  Good afternoon, Your Honor.

13     Robert Lengeling appearing with Mr. Vang.

14          THE COURT:  Good afternoon.

15          We are here today for sentencing.  Mr. Vang, would

16     you come forward to the podium with your counsel, please.

17          In preparation for sentencing today, the Court has

18     reviewed the presentence report, which was prepared by

19     probation, the relevant provisions of the sentencing

20     guidelines in this case, and the position papers that have

21     been submitted by the defense and by the prosecution.  I've

22     also consulted with the probation officer in this case and

23     rereviewed the plea agreement that you signed, Mr. Vang, and

24     the Indictment filed in this case as well.

25          Mr. Nelson, have you received a copy of the PSR

```
1    and the addendum?

2              MR. NELSON:  I have, Your Honor.

3              THE COURT:  And do you have any objections to it?

4              MR. NELSON:  No, I do not, Your Honor.

5              THE COURT:  And, Mr. Lengeling, have you and your

6    client received a copy of the PSR and the addendum?

7              MR. LENGELING:  Yes.

8              THE COURT:  And you've read and discussed those

9    documents?

10             MR. LENGELING:  Yes.

11             THE COURT:  You did note objections in your

12   briefing.  What objections are those on which you'd like to

13   be heard?

14             MR. LENGELING:  Well, it's not necessarily

15   objections necessarily with the PSR, Your Honor.  It's just,

16   quite simply, an argument about disposition here.

17             THE COURT:  All right.

18             MR. LENGELING:  I think the guideline calculation

19   is appropriate.  We're not really arguing about that.

20             THE COURT:  All right.  You did have an objection

21   to paragraph 38 of the PSR, and I am wondering if you

22   maintain that objection here.

23             MR. LENGELING:  Let me just double-check that,

24   Your Honor.

25             THE COURT:  Sure.
```

1          MR. LENGELING:  We would withdraw that objection.

2    I mean, I think that just is based on other parts of the

3    investigation that are not necessarily a major part of what

4    we're going to discuss here today.

5          THE COURT:  And I think just to be clear, I'm not

6    going to consider paragraph 38 and not rely upon it in my

7    sentence either, so I will let it remain in the presentence

8    report given that the objection has been withdrawn; but to

9    be clear, because it has to do with other parts of the

10   investigation, I'm not going to rely on it in determining

11   sentence in this case.  Therefore, I'm going to adopt as

12   findings of the Court all of the factual statements

13   contained in the PSR.

14          I will first determine the guidelines.  And for

15   those folks in the gallery, there are sentencing guidelines

16   that apply that are the starting point for me.  I consider

17   those guidelines in determining the ultimate sentence, and

18   then -- so this is really a two-part inquiry for the Court.

19   The first is to determine what the guidelines are, and the

20   second is to determine what ultimate sentence the Court

21   imposes.

22          So as to the guidelines first, the first thing I'm

23   going to do is grant a two-level downward adjustment in the

24   offense level for acceptance of responsibility, and,

25   therefore, I determine that the guidelines apply as follows:

1    The total offense level is 10, the Criminal History Category

2    for Mr. Vang is I, the imprisonment range according to the

3    guidelines is 6 to 12 months, the supervised release range

4    would be one year, and the fine range 4,000 to $40,000, and

5    a special assessment of $100.

6           Does the Government have any corrections or

7    objections to those calculations?

8           MR. NELSON:  No, Your Honor.

9           THE COURT:  And, Mr. Lengeling, any objections or

10   corrections to those calculations?

11          MR. LENGELING:  No, I don't think that changes

12   anything, Your Honor.

13          THE COURT:  All right.  And so both parties here

14   have requested something different from 12 to 18 months.

15   The Government asks for an upward variance of 18 months, and

16   the defense asks for home confinement of some sort or

17   probation.  I want to hear both of you out on that.

18          I also want to address restitution, so before I

19   hear you out on the variance, I'm going to ask Mr. Nelson

20   the Government's position on restitution.

21          MR. NELSON:  Thank you, Your Honor.  As stated in

22   the presentence report, after reviewing the Mandatory Victim

23   Restitution Act and the other statute, the Victim and

24   Witness Protection Act, the Government's position is neither

25   of those statutes apply to the particular offense with which

1    Mr. Vang was convicted in this case.

2              The Court would have authority to order

3    discretionary restitution as a condition of supervised

4    release or probation; however, in this case, probation has

5    conferred with the victim's family in this case, who has

6    indicated they do not wish to seek a order of restitution at

7    this time.  So at this point, Your Honor, the Government

8    believes restitution is not at issue in this case.

9              THE COURT:  All right.  So based on there being no

10   request for discretionary restitution by the victim's

11   family, then I will -- if I -- it would be only a term of

12   supervised release, so that's helpful to the Court.

13             Now I'd like to address the variances that you

14   each are seeking, and either one of you can go first.

15   Mr. Vang, at the very end I give you -- I'll also have the

16   victims speak, if the victim and the family want to, and you

17   get the last word here as the Defendant.  That's my typical

18   practice.

19             Either Mr. Lengeling or Mr. Nelson?

20             MR. LENGELING:  Well, I'm at the podium,

21   Your Honor.

22             THE COURT:  Go ahead, sir.

23             MR. LENGELING:  Thank you.  I'm not sure that this

24   is necessarily a variance that we're requesting.  I think

25   probation is available under sentencing options in this

1    case, Your Honor.  There's nothing that I'm going to be able

2    to say here today to make the victim's family feel better

3    about what happened here because, frankly, the facts of this

4    case are quite troubling.  Same with my client, I'm not sure

5    that there's anything that he can tell either you or this

6    family here today that's going to make him feel better about

7    what happened.

8          There is no restitution request here, Your Honor,

9    because, frankly, there's a civil lawsuit now.  And he was

10   just served with it today, and this is going to be going on

11   for some time.  No matter what happens here today we're

12   moving on to another stage.  So it's unfortunate but also

13   not that unexpected, I guess, Your Honor.

14         So my client's position -- and he'll address this

15   later -- he is greatly remorseful.  As I indicated in my

16   filings, when I speak to his friends and family, he's

17   described as such a loving and caring person, but what

18   happened here is clearly not like that.  And as I said

19   earlier in my writing, Your Honor, you can be both of those

20   things at the same time and -- you know, and like I said,

21   these are -- they're troubling facts, but when you talk to

22   Mr. Vang, it's less troubling in terms of what's going on in

23   his life now.

24         He can't go back and change what happened, and as

25   much as he may wish to be able to do that, he can't.  He can

1    only go forward and prove that he can do better.  There's

2    really nothing else he can do.  You can't take away the pain

3    that that individual felt, money damages or not, and he

4    lives with that, Your Honor.  And it may be small

5    consolation to anybody here listening to me, but he does

6    live with that on a daily basis, and he does come here sort

7    of not just embarrassed, but, frankly, somewhat broken in

8    the sense that he really did -- he broke the trust that he

9    had with these individuals, with this family, not just the

10   patient, but the whole family, and that's not what you are

11   supposed to do when you're here to care for somebody.

12        So, Your Honor, I believe that the good news in

13   this case is that he was very successful in treatment.  He

14   has a very -- I guess you could describe it as a glowing

15   review from where he -- where he attended treatment at the

16   Haven in Woodbury.  He was an inspiration to peers.  That's

17   not always the case that you hear, and, in fact, we have to

18   somewhat expect relapses when there's addiction issues.

19        We are now over a year out from when these

20   incidents took place, and I think the only time we've had

21   any issues with regard to relapse were before the federal

22   matter took place.  He was under release conditions in Anoka

23   and had some issues with the UA back in October of 2018, and

24   since that time has had no problems.  He's shown himself to

25   be able to live -- when he's given a set of rules, he can

1     live by them and he will follow those rules.

2              One of the concerns I had, of course, is that even

3     if he does get a prison sentence -- even if you were to

4     grant the Government's variance request and give him

5     18 months, it's a relatively short time compared to what we

6     typically see in federal court.  Then he's out.  Then he has

7     a year of supervised release and we move on.

8              I'm concerned about what happens five years from

9     now, six, seven years from now, and I would not want --

10    certainly he's not going to be working in this field ever

11    again.  I mean, that's over, but what I don't want to see is

12    relapse.  I don't want to see an individual like Mr. Vang

13    slide back into use issues.

14             I mean, this is an opioid problem that started

15    with pain medication; and as we know, when addiction grips,

16    Your Honor, people will do whatever it takes to get their

17    hands on medications or whatever it is that they're trying

18    to get.  Absolutely not an excuse, it's context.

19             And we're also dealing with an individual here

20    that, you know, pardon me for saying so, has struggled over

21    his lifetime with intellectual and cognitive challenges,

22    frankly, and when he saw an opportunity, he seized it here.

23    Absolutely wrong.  There's really no excuse for it, and he

24    doesn't make excuses.

25             But as I said in my filings, I'm concerned about

1   having him, after being so successful with treatment in the

2   community, to then put him in a prison situation where he

3   spends his day with untreated drug addicts, criminals, bad

4   influences, whatever it may be.  That's -- that's how things

5   can backslide.  Now we'd expect that while he's in the BOP,

6   he's not going to be using, obviously, he'll be in custody

7   if that were the case.  It's when he gets out.  And I think

8   proving yourself in day-to-day life, whether that's in

9   treatment or just living with -- in a sober life, is much

10  more successful than doing that in a custodial situation.

11          Prison in this case is truly just a punishment,

12  and I can understand where the Court and certainly the

13  family here today would want to see punishment given the

14  facts here, but, again, I think taking into account the

15  overall context of my client's efforts, I don't know that

16  that's necessarily the right approach either.

17          Home detention may seem easy, but it's not

18  necessarily easy, as it has been recognized by federal

19  courts.  I mean, it's clearly a restriction on liberty.

20  It's not cheap.  It's accountability is really what it comes

21  down to.  He will have to abide by rules of no use,

22  potential testing, whether he's on probation, supervised

23  release, whatever it may be.  He's not out of the woods on

24  this thing.  I mean, federal probation is strict.  And if

25  that's what he has to do, he can -- he'll have to live by

1    those rules or he goes to prison for sure.

2         And so, Your Honor, another policy I think

3    behind -- well, this is what I see sometimes.  I hate to

4    make an analogy to something less serious than this, but in

5    state court often we see staggered sentencing where you will

6    randomly impose -- and I'm not asking you to do this, but

7    I'm using it as an analogy -- there's home detention,

8    monitoring things that are somewhat random and imposed upon

9    a person in order to break up habits, break up routines and

10   make sure that people are, in fact, being accountable.  I

11   think Mr. Vang here has shown that he doesn't necessarily

12   have -- we haven't had issues with him relapsing back into

13   use again, but we don't want to see that happen.  If he does

14   get into routines, home detention is a way to break up those

15   routines.

16        Frankly, I don't think that's an issue with

17   Mr. Vang, however.  He does have a large support system and

18   I -- I'm going to say it's about half the room, maybe not

19   quite, but about half the room.  Much more people showed up

20   here today than I anticipated, in fact, but they're all here

21   supporting Mr. Vang, because as bad as it was what happened

22   here, these people love him and they see that there's a very

23   good side to Mr. Vang, and they want to see the best for

24   him.  And so when he is -- he's welcomed with these people

25   whatever happens.

1          I am asking you, Your Honor, to place him on that

2     probation sentence with that intermittent home detention.  I

3     don't know if probation can accommodate more of a random

4     schedule with that, but that would be my request.

5          His income right now, Your Honor, is minimal.

6     Obviously now he'll have to defend a civil suit, but he'll

7     deal with that.  Obviously that's not what we're here for

8     today.  But whatever money he has, Your Honor, is -- it's

9     not much, and so I'm asking the Court to not impose a fine

10     here, have the money available for him to do any further

11     treatment that he may have to do, and be able to answer to

12     the civil suit.

13          Other than that, Your Honor, if the Court does

14     impose a sentence here that includes custody time, I would

15     ask for him to be able to self-surrender.  He has some

16     things he'd like to take care of in his life before he does

17     that.  Typically I would ask for two to three weeks.  We're

18     sort of in that strange holiday season, so I don't know how

19     that would play in with getting a designation.  My client

20     tells me that he will do whatever is required of him to

21     cooperate with making that designation happen if that's

22     where the Court goes with this.  I don't think you'll see

23     any problems with him arriving on time wherever that may be.

24     I would anticipate that that would be a local place.

25          He would, in fact, ask for a recommendation of

1   somewhere in Minnesota.  I guess Sandstone.  I don't know if

2   he -- that may be even higher than where he would end up,

3   but certainly he would want to stay as close to home as

4   possible.

5          So I think, Your Honor, for purposes of the

6   record, I can address the Government's -- any objections to

7   the Government's requests later, unless you want me to do

8   that now?

9          THE COURT:  Yes, I'd like you to do that now --

10         MR. LENGELING:  Okay.

11         THE COURT:  -- since you know what it is.

12         MR. LENGELING:  Sure, yeah.  As we all know, the

13  Government is asking for an upward variance to 18 months,

14  and I filed an objection.  And I think the Court in a

15  procedural manner would have to find that the guidelines are

16  somehow unreasonable in this case, and I don't know that

17  that's the case.  I think that they are quite reasonable and

18  have taken into account issues with regard to abuse of

19  trust, vulnerable victim, those sort of things, and it did

20  increase his potential guideline sentence here.  And I think

21  that that's -- we didn't object to that.  We agreed that

22  those were appropriate enhancements that would raise his

23  potential sentence here.  They do apply.

24         But in order to make a variance upward, I think

25  you would have to find that that's not enough somehow and

1    that somehow the Guideline Commission decided that -- came

2    up with a number that's too low.  I think that those very

3    factors that the Government cited here have already been

4    accounted for, so I think the guideline range of 6 to

5    12 months, or in my argument potentially home confinement

6    with probation, is appropriate as a guideline range, and so

7    I think that the variance should be denied, Your Honor.

8    Thank you.

9            THE COURT:  Thank you.  I'll have you both sit

10   down, and I'm going to hear from Mr. Nelson and any victims

11   who wish to speak.  Mr. Nelson.

12           MR. NELSON:  Thank you, Your Honor.  Despite the

13   fact that Mr. Lengeling and I are advocating for different

14   end points, the candid -- to be candid with the Court, I

15   agree with much of what he says.  I struggled with this, as

16   I imagine the Court will, because there's a lot of factors

17   to be weighed here, and I, I think similar to the Court,

18   have to take into account the positives of the history and

19   the characteristics of Mr. Vang.

20           As Mr. Lengeling pointed out, I understand

21   Mr. Vang himself is battling opiate addiction.  I understand

22   that he, you know, has some traumatic issues in his

23   childhood.  He self-surrendered his nursing license pending

24   this case and he has done well at least since coming over to

25   federal court on release.  Negative drug tests, voluntarily

1    checked into therapy, and treatment and received, as

2    Mr. Lengeling indicated, a glowing recommendation from his

3    aftercare provider.  But all that said, even considering all

4    those things as I have and have wrestled with them, to me

5    they simply don't offset what, in the Government's view, are

6    the truly egregious facts of this particular case.

7            And as Mr. Lengeling said, I am requesting a

8    variance, and it is on the grounds that I think the

9    guidelines for this offense do not fully account for the

10   type of conduct that occurred in this case.  The guidelines

11   for this offense cover the obtaining of a controlled

12   substance by fraud.  Now, in other cases, that could easily

13   be writing a forged prescription and presenting it to a

14   pharmacy, or lying to a doctor to get a medication to which

15   you were not entitled, but what those guidelines do not

16   account for is the harm on another human being that was

17   visited in this case.  The offense is called obtaining a

18   controlled substance by fraud, but at -- in substance here,

19   what we have is a rather egregious case of elder abuse, and

20   it is an abusive conduct that took place here.

21           Mr. Vang took medications to which he wasn't

22   entitled, to be sure, and for that, the guidelines have

23   determined a base offense level of 8 is appropriate.  But

24   what the guidelines do not account for is that he took them

25   out of the mouth of someone who was dependent on them.

1          THE COURT:  They do account for vulnerable victim,

2     do they not?

3          MR. NELSON:  Well, actually I disagree with that,

4     Your Honor.

5          THE COURT:  Go ahead.

6          MR. NELSON:  In my view, vulnerable victim refers

7     to the characteristics, the nature, and the facts of the

8     person being victimized.  And the abuse of trust accounts

9     for the role which defendant occupied and which he committed

10    this crime, but they don't account for the -- the harm,

11    frankly.  I think the fact that this was a harmful conduct,

12    physically harmful, caused pain, suffering over an extended

13    period of time are not accounted -- is not accounted for.

14    The vulnerability of the person who's harmed is what's

15    accounted for by that two-level enhancement, but not the

16    extent or nature or character of the harm which she suffered

17    over the four months in defendant's care.

18          So I disagree.  I think that vulnerable victim is

19    really looking to the characteristics of the person harmed,

20    but not the harm itself.  And for that reason, I think the

21    guidelines are simply inadequate to address the type of

22    conduct that we see here, where it is essentially a case of

23    elder abuse.

24          And in this case, not just that it was a case of

25    elder abuse, but it's a case that went on for months, that

1    the family was left searching for answers, and, in fact,

2    themselves were subjected to suspicion as to whether they

3    were the ones who were, you know, causing this problem by

4    their own doctors.  In the four months they searched for

5    answers while the victim was in pain, was suffering is

6    simply just not accounted for here in these guidelines, and

7    for those reasons, I am asking the Court to find that the

8    guidelines don't account for this level of conduct and to

9    vary upward.

10              Certainly the other thing to point out is the

11   Eighth Circuit has held the Court can also vary upward based

12   on facts that are accounted for in the guidelines if the

13   Court makes a sufficient record as to why the variance is

14   appropriate.

15              And here, to me, the imbalance of power, as I

16   indicate in my sentencing memorandum, between the Defendant,

17   who I think the family will explain to you here, they

18   trusted implicitly.  I think they were probably in a

19   situation where at the time before they figured out what was

20   happening, the Defendant was the last person they would have

21   suspected, because they trusted him so implicitly and they

22   trusted him to look out for the victim's best interests and

23   to look out for her health, and certainly not to engage in

24   conduct in which the Defendant was essentially letting the

25   person who was under his care suffer for months and to leave

1    them without any indication or knowing as to why.

2              And that just wide gulf between the power and

3    balance that the Defendant had by virtue of that trust that

4    was placed in him and the victim who really was in no

5    position, even if she hadn't trusted the Defendant, to

6    realize what was going on and to catch what was going on.

7              She had come off of two surgeries during which she

8    had had an intervening I believe it was blood infection or

9    sepsis, severe complications, had a second surgery, and then

10   was prescribed these controlled substances to help deal with

11   what I can only imagine was the significant pain that came

12   with the aftereffects of those surgeries.  And she was

13   deprived of those medications, suffering, and in their stead

14   was given essentially allergy medication, which, as the PSR

15   indicates, in conjunction with her other medication regimen,

16   left her in a condition where she was drowsy, lethargic,

17   could easily have had slips or falls and harmed herself

18   tremendously or even fatally in this case.  Now thankfully

19   that didn't happen, but that was part of the danger that was

20   posed by this conduct.

21             This fact that the Defendant had a position,

22   had -- was part of a profession, a calling, which is -- in

23   which people are called to give care, to look out for the

24   best interests of another and yet betrayed that central

25   tenet of his profession in order to pursue his self-interest

1   and left his own patient to suffer really is what I keep

2   coming back to are the egregious facts of this case that

3   call for a more significant custodial sentence than the

4   guidelines require in this matter.

5           THE COURT:  Mr. Nelson, do you know if the

6   position of trust and special skill application, that

7   guideline application upward adjustment would apply if the

8   Defendant here were a personal care assistant rather than

9   one who holds a nursing degree?

10          MR. NELSON:  You know, I don't know.  I think it

11  can be by virtue of a skill or their role.  I believe it

12  would apply in either case, that's my -- not having looked

13  into it here, I believe it would apply in either case given

14  the -- again, the trust, the person is let into their home,

15  is allowed to move about freely, because the understanding

16  is -- societally the understanding is this person will look

17  out for me, this person holds a duty where they will care

18  for my best interests.  I think it would apply in either

19  case, but I haven't researched that, Your Honor, so I don't

20  know.

21          THE COURT:  Thank you.

22          MR. NELSON:  All those factors together,

23  Your Honor, I think call for the Court to impose a

24  significant custodial sentence in this case, and I do agree

25  some of that is punitive.  It's to express the seriousness

1    of this conduct, and to send a message that the law and the

2    United States and this Court take this type of conduct very

3    seriously.

4          I think those -- all those factors are things that

5    the Court should consider.  I think even in light of some of

6    the mitigating factors that Mr. Lengeling pointed out, they

7    just don't offset the egregious nature of the offense in

8    this case, and, therefore, I do ask the Court to impose a

9    custodial sentence of 18 months.

10         Would the Court like to hear from some

11   representatives of the victim's family now?

12         THE COURT:  I have.  My understanding is that

13   there are a few.  I'm not sure how many.  I've indicated

14   that I'm welcoming hearing from all of you, and have tried

15   to indicate a bit of a time limit only -- only because we're

16   in court and that's the way that court goes, not because I'm

17   not interested in hearing what all of you have to say.  So

18   with that, Mr. Nelson, I'll just have you introduce these

19   folks.

20         MR. NELSON:  Sure.  Actually everyone can come up

21   who would like to be present, and, Your Honor, it will just

22   be a minute.  I believe the victim is being brought up as

23   well to at least be present.  I don't believe she'll speak

24   directly.

25         THE COURT:  Thank you.

```
 1              MS. SHAW:  She's not going to be able to fit.

 2              THE COURT:  We can't move it.

 3              MS. SHAW:  Good afternoon, Your Honor.

 4              THE COURT:  Good afternoon.

 5              MS. SHAW:  Do I need to lower this?

 6              THE COURT:  Yes, and speak right into it is just

 7    fine.  Mr. Nelson can help you.  Ma'am, I'm going to have

 8    you come forward just a bit so you can face me if you wish.

 9    Is that good?  That's all right for her?  All right.

10              MS. SHAW:  Okay.  I would like to introduce my

11    family to you.  I'm the youngest of three daughters.  My

12    mother LaVonne Borsheim, the victim present; my father,

13    Roger Borsheim, husband of 67 years.  Today we have my

14    sister, Pam Hultgren, who is the middle child; my sister --

15    older sister, Susan, to her right.

16              THE COURT:  And Susan's last name?

17              MS. SHAW:  Peterson with an s-o-n.

18              THE COURT:  Thank you.

19              MS. SHAW:  And then we have my niece Elizabeth

20    Hultgren, and then my daughter Emily Prideaux.

21              THE COURT:  And your name?

22              MS. SHAW:  Kari Shaw, S-H-A-W.

23              THE COURT:  And how do you spell Kari?

24              MS. SHAW:  K-a-r-i.

25              THE COURT:  Thank you.  You may proceed.
```

1          MS. SHAW:  Thank you.  So I would like to start

2     with my mom's statement.  It's a little rough writing here,

3     but I'm going to try to make it through.  These are words

4     from my mom.

5          Your Honor, I am the victim, LaVonne Borsheim.  My

6     life has been shattered by the deception of my former nurse

7     from LifeSprk Home Healthcare.  I am tormented every day in

8     fear not being able to sleep and have tried so hard to

9     regain my strength, but have only grown weaker.  I'm solely

10    dependent on my husband and my family for my care.

11         I haven't been able to attend any of the functions

12    I normally enjoy and want to go to.  I've missed out on so

13    much.  I could have lost my life due to La Vang giving me

14    medications I wasn't supposed to have yet, left me suffering

15    without the medications I was supposed to have.  He took

16    away my trust and confidence in the healthcare industry

17    forever.

18         Your Honor, I'm asking that he serves the prison

19    time and the maximum time you can give to him, time to think

20    about what he did to me and my entire family.  I will never

21    get back the time, and I won't enjoy -- and -- I won't get

22    back, and the time I won't enjoy in my future as I'm left to

23    live in this body the rest of my days to suffer from the

24    results of the wrongdoings.

25         To La, what you did was cruel and wrong.  I am

1    praying for you that you will learn from this and somehow

2    find a way to redeem yourself.

3            The next statement I would like to read is from my

4    dad, Roger Borsheim.

5            Good afternoon, Your Honor.  The following

6    statement is from our dad, Roger Borsheim, my mom's only

7    love of her life of 67 years of marriage.  I'm not real sure

8    where to begin as this entire ordeal has taken so much from

9    our lives.  We are truly looking forward to getting on to

10   some normalcy after today.  From his first visit bowing

11   before me as he entered the door, as he did every day,

12   perfectly camouflaged with his medical equipment, scrubs,

13   and identification from LifeSprk Home Healthcare.  He gave

14   us gift certificates for restaurants, along with medical

15   equipment.  We didn't know where it was coming from.  Now we

16   understand it was his way to gain trust and keep us close to

17   him.  Who would think anything bad of a guy who was so nice,

18   giving gifts.  This was the start of his deceptive ways and

19   capitalized on my position of being old and naive.  I

20   trusted him and everything he was doing with placing meds in

21   her weekly dispenser, not thinking for a minute that what he

22   was take -- that he was taking advantage of us in his role

23   of LifeSprk nurse, and truly what he was doing was killing

24   my wife.

25           The few things we have been able to enjoy due to

1      my wife's disability have been going to church every Sunday,

2      along with our senior group every Thursday, having neighbors

3      over for coffee and fellowship and being involved in our

4      community and charities.  Since this has all taken place,

5      LaVonne is entirely too weak, never has regained the

6      strength, as he had given her so much medication that she

7      was sleeping over 90 percent of the day.  Our day is spent

8      now with me dressing her, feeding her, bathing, doing her

9      hair, doctor appointments, prescription refills, only to

10     restart another day.

11          He has stolen more than meds.  He has stolen our

12     life, and our lives with what we had left to enjoy.  We've

13     missed not only our church family but our own family

14     get-togethers as LaVonne is too fragile and weak to have

15     attended events.  This is only because he felt his needs and

16     life were more important than ours.

17          We have felt completely violated that someone we

18     had invited into our home could do this.  I have worked so

19     hard to help my wife as her caregiver, and I took the

20     medication as such a vital part of my responsibility and

21     here someone was working opposite of me.

22          It is a terrible thing when someone has no regard

23     for someone that is in great pain and depends on the

24     medication to live life somewhat pain-free.  It is also

25     heartbreaking to watch someone you love lose hope for living

1    and to hear her praying every day that God would please let

2    her die as the pain was unbearable.  I at one point told my

3    girls that Mom was diminishing and that she was growing

4    weaker by the day and afraid she wasn't going to survive

5    much longer.

6           I am certain there are other victims that have

7    suffered at the hands of this nurse.  I want the

8    consequences of his actions to be great enough that others

9    will think twice before feeling they can prey on innocent

10   people like my wife and I were.  To see my wife in pain for

11   the past five months -- for those five months, it took a

12   vital thing from us, faith, trust, and hope.

13          So today, Your Honor, I'm asking that you impose

14   the highest level of prison time that is possible.

15   Probation I feel is not enough because he, in fact, has put

16   us in a prison of never being the same again.  We no longer

17   enjoy the safety and security we once knew.  How do we ever

18   trust full-heartedly a nurse again, someone who took an oath

19   to do no harm?  I believe that with you giving him the

20   maximum sentence that you, Your Honor, will shine a huge

21   light on our State of Minnesota on how seriously we take

22   this crime, especially with our current soaring opiate

23   crisis.

24          Being a Christian man, I've had to look at the

25   forgiveness factor in all of this, as I am called to be like

1    Jesus, and reminded of the verse in Galatians 6:7, you reap

2    what you sow.  There are consequences for what we do.

3            In closing, I love my wife with all my heart, just

4    like the day I married her, and I took a vow before God that

5    I would love her in sickness and in health till death do us

6    part.  I'm keeping that promise.  I only wish that what

7    years we have left on this earth would not have been stolen

8    like they were from someone so selfish.  Instead, she is

9    left to live like a prisoner in a weakened and extremely

10   fragile body.  Thank you, Your Honor, for allowing me to

11   voice my true heartfelt pain and brokenness.

12            And now I would like to call my sister.

13            MS. PETERSON:  Good afternoon, Your Honor.

14            THE COURT:  Good afternoon.

15            MS. PETERSON:  I'm Susan Peterson, the first-born

16   daughter of Roger and LaVonne.

17            MS. PAM HULTGREN:  And I'm Pam Hultgren, the

18   middle daughter.

19            THE COURT:  Could you spell Hultgren for me,

20   please?

21            MS. PAM HULTGREN:  Hultgren, H-u-l-t-g-r-e-n.

22            THE COURT:  Thank you.

23            MS. JOHNSON:  We come this afternoon as a team

24   because Pam and I have been a team since this whole thing

25   evolved.  We come once a week to help with cleaning,

1  laundry, mom's personal needs.  And just to paint a picture

2  of my mom, she was the life of our home and our family.

3  We'd call her and say, Mom, we're coming over tonight to

4  bring dinner and we're going to clean, and she would be

5  excited to have us girls come.  By the time we'd get there,

6  she was so drugged we couldn't hardly wake her up to have

7  dinner with us, to talk, and, I mean, it was sad.

8          Pam and I, we do what we can, but since -- our

9  lives have been changed with -- our lives and our parents'

10  forever from LifeSprk's nurse, La Vang, who entered our

11  home.  We assumed that he was there to help my mom get

12  better and stronger, but instead he stole her life, her

13  trust, betrayal, and so we're just --

14          MS. PAM HULTGREN:  I just want to share one piece

15  too --

16          MS. JOHNSON:  Sure.

17          MS. PAM HULTGREN:  -- about one glimpse of what

18  our life looks like.  In the summer, we have an annual

19  garage sale that my mom heads up, because she's always been

20  a big piece of that and loves it, and when we had our last

21  garage sale, she was so tired and so sleepy and drugged that

22  she had to sleep.  She had to -- she said, I'm going to have

23  to go and lay down when she was normally out there helping

24  us, and so the whole day she slept away.  At dinner time we

25  came in to wake her, and I was in the kitchen getting dinner

1    together, and Sue went to wake her and she was shaking her

2    and yelling her name and she wouldn't wake up.  And I

3    thought she was gone, had died.

4         Sue finally got her up and picked her up and she

5    fell into the wall, and she was so drugged that we thought

6    we were going to have to take her to the hospital that

7    night, but we finally got her to sit up.  But our worry and

8    our concern was that had she passed away that night, we

9    never would have ever thought it was the nurse that was --

10        MS. JOHNSON:  Drugging her.

11        MS. PAM HULTGREN:  -- supposedly doing her good,

12   and instead, he was harming her in a way that we -- she

13   could have lost her life that night.  She had so much

14   medication in her.

15        So in closing, Your Honor, we thank you for

16   letting us share this statement together and ask that you

17   give La Vang, the LifeSprk nurse, the maximum sentence that

18   you're able to impose, and make a statement to the rest of

19   all the nurses and healthcare industry out there that if

20   they're ever thinking of stealing meds from a patient, that

21   they would realize what would be lying ahead for them.

22        THE COURT:  I thank you both.

23        MS. JOHNSON:  Thank you.

24        MS. PAM HULTGREN:  Thank you.

25        MS. ELIZABETH HULTGREN:  Thank you for this time,

1    Your Honor.

2              THE COURT:  Good afternoon.

3              MS. ELIZABETH HULTGREN:  My name is Elizabeth,

4    and -- I'm sorry -- I am Roger and LaVonne's granddaughter.

5              THE COURT:  And your last name is Hultgren as

6    well?

7              MS. ELIZABETH HULTGREN:  Yes.

8              THE COURT:  Go ahead.

9              MS. ELIZABETH HULTGREN:  Since this ordeal began,

10   our family's lives, as you can see, has been irrevocably

11   changed.  I have watched the weight that this has caused for

12   my grandma and my grandpa.  I call them nana and papa, all

13   of the grandkids do.  They have carried this weight, sudden

14   fear of strangers, the stress and confusion, the physical

15   and emotional turbulence that this has left not just in

16   their home, but across our entire families.  We're a close

17   family, and even though we try to come alongside them to

18   help carry this weight, no one experienced this quite as

19   fully or to the depth that they have and the loss of trust

20   that it has cost them.

21              As a teacher, I understand professional conduct

22   and how essential it is that those in your care be able to

23   trust you and know that you have their best interests at

24   heart.

25              Prior to this experience, we all emphatically

1    believed that the doctors and the nurses caring for nana had

2    this professional conduct and believed that Mr. Vang had

3    her's and papa's best interests at heart.  This was not an

4    isolated event.  He made months of choices to return and to

5    continue the abuse, and going back and taking advantage of a

6    vulnerable adult goes against every professional conduct

7    there is, whether it be for a nurse or just as a person.

8         I'm engaged to a wonderful man who loves my

9    grandparents like I do and who also shares my nana's love of

10   Scrabble, and sharing these memories and having them both

11   there for my wedding truthfully I didn't think was going to

12   happen through this whole experience.

13        I am not always convinced -- or I was not

14   convinced that we would get this time with her today.  She

15   is here because the healthcare system -- or she is not here,

16   excuse me, today because the healthcare system held her up.

17   She is here because of God's grace.  She survived La Vang,

18   but she could have just as easily not.  I ask you to use

19   this opportunity today to show nana and papa, as well as the

20   other families who have been similarly affected, that

21   professional conduct and trust do still matter in our

22   healthcare system as well as nursing.

23        THE COURT:  Thank you.

24        MS. PRIDEAUX:  Hi there.  I'm Emily Prideaux, the

25   other granddaughter.  Your Honor, thank you for hearing our

1    family's story today as we've come to the closing of one of

2    many long and arduous chapters that continues to affect us

3    each and every day.  My mother and I both live on the West

4    Coast in California and flew all the way here to be part of

5    this today, but that doesn't account for the many years and

6    months that we've watched her suffer, and we have also

7    suffered because of this.

8            My grandparents sit aside from me here today with

9    the support of their daughters, the grandchildren, and also

10   Elder Voice behind us, who have also been touched by this

11   story, as well as all of the victims that they have been

12   alongside.

13           It hurts to think that my grandmother is not the

14   only person who has fallen victim to someone else's poor

15   choices and abuse because there are so many others today

16   that have dealt with this as well.

17           I do stand proud alongside my family to defend the

18   matriarch of our family, who has suffered insurmountable

19   levels of pain, sadness and misfortune.  You may not have

20   27 years of beautiful memories with my grandparents like we

21   all do, but I can share with you that they are the most

22   precious and loving people that are so undeserving of the

23   abuse that they have endured because of La Vang.

24           My grandmother has always been a giving, faithful,

25   and selfless woman who would give anyone a second chance no

1    matter the cause.  Even after years of seeing the drug abuse

2    and legal troubles that my own father has put my family

3    through, she still found a way to be forgiving and

4    understanding of those who struggle with substance abuse.

5    It's a serious issue, and it's not something to undermine;

6    however, those that have done this, they deserve and need to

7    pay the price for what they've done.

8            She's always found a way to show love and support

9    without holding any grudges.  I can speak firsthand to this

10   truth as I've seen it over the course of my entire lifetime.

11   As a woman of faith and now as part of the elderly

12   community, she has many times been unaware of the war on

13   drugs in this state, this country, and our world today.

14   Additionally, her decline in her mental and physical health

15   has influenced her ability and awareness towards those who

16   could possibly take advantage of the situation, especially

17   in the comfort of her own home.

18           Home healthcare was created to help the efficiency

19   of needs for outpatient visits and to increase comfort for

20   those who are unable to constantly be in and out of medical

21   offices and emergency rooms.  Unfortunately, that system

22   worked against her, and the negligence of many parties

23   involved.  Ultimately, that has led us to this hearing today

24   in hopes that La Vang will pay the price for his

25   unforgivable abuse, federal and state-side crimes.

1           To be scared to sleep in the home where she still

2   lives with my grandfather, the very home that she raised all

3   three of those children in, is heartbreaking.  La Vang took

4   peace and comfort from her and my entire family to feel safe

5   in a place that she called her pride and joy for over

6   50 years.

7           In a matter of a few short months, her entire

8   world was flipped upsidedown, and the effects have bled into

9   each and every one of our family's lives.  Sleepless nights,

10  emergent hospital stays, and many moments of thinking we may

11  leave her due to his theft, deception are just a short list

12  of the trauma we've experienced throughout the years.  Both

13  here in Minneapolis and across the country, we have suffered

14  greatly.

15          Being away from the scene myself and finding out

16  what has transpired without any idea of the months of

17  torture she had incurred during this time also led to

18  hearing and watching her deteriorate became such a burden by

19  the abuse that she no longer wanted to live.  The fear and

20  unease she has experienced and still experiences today is

21  insurmountable, while the rest of our family also deals with

22  this day-in and day-out.

23          My partner and significant other is an MD who

24  makes house calls and is a part of home healthcare, has not

25  even had the opportunity to meet my grandparents, but stands

1    beside them knowing that he takes full, great care of other

2    people in their homes and can't imagine anyone doing this to

3    someone, especially like them.

4         My grandmother has always had a good gut instinct

5    about people, yet was completely fooled and deceived by this

6    person's ability to manipulate and take advantage of her and

7    our family's trust.  His oath to care for and to keep the

8    best interests at the forefront of his responsibilities was

9    reversed, and, yet, he decided to use that as an opportunity

10   to take advantage of naive and precious godly people.

11        The lies, the deception, and all of La Vang's

12   manipulation will never be repaid the way it should be.

13   Life behind bars wouldn't do justice, and that my

14   grandparents and other victims deserve justice.  Four years

15   doesn't even come close enough.  What we're asking for

16   doesn't do any justice.

17        As a daughter of an addict who has been in and out

18   of the system for over four years, I can relate to

19   rehabilitation as being part of turning someone's life

20   around; but in this situation, I don't feel that

21   rehabilitation will ever work for a person of his caliber.

22   His ability to take advantage of such sweet people is

23   appalling.  I would stand here to defend anyone, not just

24   them, knowing that they have suffered throughout far too

25   much.

1     He has stolen years from our life and from their

2     life especially.  He's caused great detriment to the

3     physical, emotional, and mental health for each member of my

4     family, especially for those across the country who can't

5     physically be here every day to help.

6     Not only does the State of Minnesota need to

7     address and make an example of this case, but these

8     punishments should definitely be enhanced and every person

9     that finds no remorse for their actions need to be held

10    accountable.

11    And to La Vang who has affected more of us than he

12    will ever realize from across the country, all the way here

13    to Minneapolis, his story and reputation will forever be

14    tarnished no matter what comes his way.  He gets to live the

15    rest of his life with this burden.  He will never forget the

16    stolen years from our family, the burned bridges and trust

17    for the healthcare system, or any hospital, pharmacy, or

18    otherwise.  He should never have been given a nursing

19    license in the first place to care for anyone with such poor

20    intentions, and what he owes us is to be locked up and away

21    from our family.

22    We are able -- we are not able to sleep

23    peacefully, and it would be nice to know that he is far away

24    from us and locked in a cell, paying full-time behind bars

25    where he belongs.

1              In closing, Your Honor, please take into

2       consideration all of the hours, the weeks, the months and

3       years that our family has suffered.  Please help us find

4       peace in our lives to give my grandparents their later years

5       in love and light rather than deteriorating in fear from the

6       repercussions that come alongside the gang affiliations and

7       dangers that La Vang has put them into.  Give him the full

8       four years, give him everything you're able.  Lift this

9       weight off of our shoulders and let us live peacefully

10      without him and his pathetic excuses in our shadows.  Our

11      ultimate goal is to see his hands tied behind bars being

12      reminded of his wrongdoings, praying that he can somehow

13      find it in his soul to never allow this to happen to anyone

14      ever again.

15              Thank you for your time.  I pray you hear our

16      cries for help as he has harmed far more than anyone ever

17      deserves.  Thank you.

18              THE COURT:  Ms. Prideaux, could you spell your

19      name, please?

20              MS. PRIDEAUX:  Emily, E-m-i-l-y; last name

21      P-r-i-d-e-a-u-x.

22              THE COURT:  Thank you.

23              MS. PRIDEAUX:  Yes.  Thank you.

24              MS. SHAW:  Thank you.

25              MS. PRIDEAUX:  I think my mom has a few more words

1    to say before Elder Voice comes up.

2                    THE COURT:  Ms. Shaw.

3                    MS. SHAW:  Thank you, Your Honor, for giving us

4    this time.  I know that it's long with all of us talking,

5    but we tried to keep in mind the time limit, and I just -- I

6    really felt it important for an organization such as Elder

7    Voice to come along.  I found an organization here in the

8    Cities.  I am from California -- I mean, not from, but I

9    live there.  So I've invited Jean Peters, who is the

10   president of Elder Voice, to come and share some -- and I

11   will give the last voice.  I will give the last word.

12                   THE COURT:  One moment.  I'm going to allow brief

13   comments.  Just respectfully, you weren't on the list, and I

14   want to make sure that this is tied to the impact on the

15   victim, which is what victim impact is all about.  So --

16                   MS. PETERS:  Right.

17                   THE COURT:  -- I'll allow a couple of minutes and

18   allow any objections that the Defendant might want to impart

19   as well because we had no notice of your coming.

20                   MR. LENGELING:  Well, Your Honor, I would just

21   under Rule 60 object.  I want the family to be heard, but I

22   think this is going past Rule 60.

23                   THE COURT:  Right.  I'm inclined to agree, so very

24   briefly.

25                   MS. PETERS:  All right.  Thank you.  I'm Jean

```
1    Peters.  I'm president of Elder Voice Family Advocates.

2    We're a nonprofit organization advocating for the protection

3    of elders and vulnerable adults.  I'm also a nurse

4    practitioner, a registered nurse.

5            Our sympathies with the family and the thousands

6    of elders and vulnerable adults who are easily targeted for

7    criminals and addicts to steal opioids.  It must be

8    remembered that many older adults often suffer from

9    cognitive loss that inhibits their ability to express their

10   pain and ask for help.

11           THE COURT:  I'm sorry.

12           MS. PETERS:  And -- I'm just -- one more --

13           THE COURT:  That's all right.  No.

14           Counsel, I'd like you to approach.

15      (Sidebar discussion off the record)

16           THE COURT:  Ms. Peterson, I know you have an

17   important -- it's Peterson; right?

18           MS. PETERS:  It's Peters.

19           THE COURT:  Peters.  I'm so sorry.

20           MS. PETERS:  Yes.

21           THE COURT:  I know you have an important role, I

22   know you have an important role to play in society at large.

23   This is victim impact, and some of what you say has to do

24   with folks who aren't before the Court today, and so I can't

25   allow your testimony here, but I appreciate your presence.
```

1     Thank you.

2               MS. PETERS:  Thank you, Your Honor.

3               MS. SHAW:  Okay.  With that being said, my name is

4     Kari, the youngest daughter.  I'm grateful to be here,

5     Your Honor, and thank you for letting me.  I decided to be

6     the last, so I'm grateful to have our mom still with us

7     today.  Last summer, my dad called and said Mom is

8     diminishing and she was praying daily for God to let her die

9     as she just could not live with the excruciating pain she

10    has now -- she was now experiencing and said I cannot live

11    like this another day.  To hear this broke my heart and

12    thought if only she had something to look forward to, so I

13    kept telling her that she needed to stay around so she can

14    get back out to my house in California.

15              You see, every winter my parents have been

16    enjoying winters with me; and since this all took place,

17    they haven't yet to return and probably won't.  She's

18    entirely too fragile in her weakened state, so the

19    likelihood of ever enjoying them again at my home has been

20    stolen from me.  It's left a huge impact.

21              One only knows of the pain she's in if you have

22    experienced it.  I was diagnosed four years ago with the

23    same disease, and I've just started my journey.  The only

24    way to describe this pain is large shards of glass inside

25    your body so that even at the slightest bit of movement, you

1    feel it's -- as though it's ripping every tendon and muscle

2    in your body.  So sometimes those pain medications, not

3    sometimes but all the time, they have worked to just

4    alleviate and take the edge off that pain.

5            My Mom would not survive shoulder replacement

6    surgery, so has depended on those medications to just keep

7    her balanced enough with staying alert, but yet out of pain.

8    To see how hard my dad works to keep her going every day is

9    remarkable.  My heart breaks for both of them as they have

10   had so much stolen from them aside from this medication

11   abuse.  You can't purchase time.

12           Since the day this happened, I have dedicated my

13   days and nights the past year, putting my job aside, to

14   research and help with anything and everything I could do to

15   get us here to this place today, hoping to find some justice

16   for both of my parents.  I have read and have met addicts

17   there that are in and out of treatment their entire lives

18   using addiction as excuses for their actions, but not

19   suffering enough consequence for them.

20           There's not enough time that will ever -- that he

21   will ever do, nor enough money to buy the time we have lost

22   with our mom.  She doesn't get the choice to redo her life

23   like Vang can, he can choose to make other decisions, nor

24   get the years on this earth that he will, the chance to

25   enjoy more laughter and fun with our family like he will

1    enjoy with his family.

2            Your Honor, I'm asking for the maximum sentence as

3    this can help to send a loud message to those out there that

4    think they can continue to abuse, lie, and steal from our

5    most precious vulnerable and elderly.

6            Let's remember the first time he stood before the

7    state judge, he was able to choose what he wanted for

8    conditions of his release, yet violated that by yet again

9    trying to get by the system, so clearly does not -- so

10   clearly he does not take what he did seriously enough to be

11   afraid of any consequences.

12           By giving him the maximum sentence, we send a

13   strong message out there and hopefully will save many others

14   from the hands of someone who took the oath he did to cause

15   no harm.

16           Thank you, Your Honor, for giving me the chance to

17   share with you today the impact this has left on my life and

18   my family's.  I appreciate the extra moments you've given

19   us.  My mom's life matters, it really does, and my -- both

20   of my parents to see the love of 67 years, it's pretty rare

21   these days.  I hope to take what happened to our mom and use

22   it to help them make a difference in this world.

23           Let me leave you with this quote.  A friend of

24   mine, Denise Brown, the sister of Nicole Brown Simpson, who

25   I traveled with and privileged to have traveled with for six

1    years speaking on domestic violence, not knowing that elder

2    abuse I would be facing years from then, she left me with

3    her quote today.  When our time on earth is through, I think

4    that if there is a heaven or hell, we will be asked to pay

5    some day, not just for what we did, but for what we didn't

6    do.  Don't think that there is nothing we can't do.

7              Thank you.

8              THE COURT:  Thank you, Ms. Shaw.  Thank you.

9              Mr. Nelson, would you help them go around the

10   table to be seated?

11             MR. NELSON:  Yes.

12             THE COURT:  Thank you.  Thank you very much.

13             Mr. Vang, before I impose sentence, is there

14   anything that you wish to say on your own behalf, sir?

15             THE DEFENDANT:  Yes, I do, Your Honor.

16             THE COURT:  Go ahead.

17             MR. LENGELING:  One second, Your Honor.  He had

18   prepared a statement, Your Honor.

19             THE DEFENDANT:  I'll make it short.  First and

20   foremost, I want to start by saying I'm truly sorry for the

21   pain I caused for the victims and the victim's family.  I do

22   not ask for forgiveness.  I was supposed to be a person of

23   trust, protection, and knowledge for this victim, yet I was

24   not.  I truly caused pain and suffering for this victim and

25   her family.  To this day I regret my actions.  I wish to

1   turn back time to prevent the pain and suffering I caused to

2   the victim and her family.  I pray that my actions will not

3   cause any distrust provided by other healthcare

4   professionals to the victim and her family.  I'm working and

5   reflecting on myself every day in order to prevent any more

6   horrendous actions from occurring again.  And, again, I'm

7   truly sorry and I apologize.

8           THE COURT:  Thank you.  Mr. Lengeling, anything

9   further?

10          MR. LENGELING:  No, Your Honor.

11          THE COURT:  Mr. Vang --

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  -- you have been charged with and have

14   pled guilty to a count of obtaining a substance by fraud in

15   violation of 21 U.S.C. 843(a)(3) and 843(d)(1).  Based on

16   your guilty plea to that count, it is now time for

17   sentencing.

18          First let me say that sentencing is by far the

19   hardest thing that I do as a judge.  I worry over it.  I

20   think about it.  I have put great consideration into my

21   sentence here today, and I appreciate, Mr. Vang, your

22   statement, as I appreciate the statements of the victim's

23   family in this case to assist in determining what the right

24   sentence is.  There is, of course, no sentence that can turn

25   back time, and no sentence that will feel true justice

1      because we cannot turn back time.  And that's true for the

2      family as it is for you, Mr. Vang.

3             The legal standard that I must apply is that in

4      determining what sentence to impose, I treat the range in

5      the sentencing guidelines as the starting point and the

6      initial benchmark, as required by *United States v. Gall*.  I

7      have not presumed that that guideline range is reasonable.

8      I, instead, consider all of the factors in the sentencing

9      statute, which is 18 U.S.C. 3553(a), including the need for

10     a sentence to be sufficient, but not greater than necessary,

11     to comply with the purposes of the sentencing statute.

12     Those purposes are to consider the nature and the

13     circumstances of the offense, the history and the

14     characteristics of the Defendant, in this case Mr. Vang.

15            And I find that a sentence of 18 months'

16     imprisonment is sufficient, but not greater than necessary,

17     to reflect the seriousness of the offense, to provide just

18     punishment for the offense, to deter you, Mr. Vang, from

19     committing crimes in the future, to deter others from

20     committing crimes in the future, to protect the public, to

21     provide you with further treatment, and to avoid unwarranted

22     disparities between your sentence, Mr. Vang, and the

23     sentences of defendants who are similarly situated.

24            In particular, the Court has taken into account

25     both mitigating and aggravating factors in this case.  There

1    are several mitigating factors in this case and they have to

2    do with you, Mr. Vang, and your remorse, your absolute lack

3    of criminal history, how well you have done on supervised

4    release in this Court, your background growing up, and your

5    addiction, which, as you know, provides context for your

6    offense, but does not excuse it.

7              Even given these mitigating factors, the

8    aggravating factors are far greater in this case.  The Court

9    is of the view that a guideline sentence is too lenient

10   given the facts and circumstances of this case.  It would

11   insufficiently capture the harm that was caused to the

12   victim and her family.  It is also insufficient to reflect

13   the seriousness of the offense and to promote respect for

14   the law by other individuals in the same profession or,

15   frankly, any home healthcare aides.  This is a profession

16   that is on the rise.  There's a great need for home

17   healthcare aides.  Our standards for it must be high as

18   well.

19             Your position, Mr. Vang, as a medical professional

20   and indeed as a nurse who took an oath, entrusted with the

21   care of elderly patients and the resulting harm to a patient

22   when that trust is broken, demands a sentence higher than is

23   indicated by the guidelines.  This is particularly true here

24   where Mr. Vang went to the house of the victim after no

25   longer employed, misrepresented his employment.  That

1    conduct, the conduct that you engaged in was ongoing, so

2    this wasn't a one-time incident, it was ongoing for a number

3    of months.  It resulted in significant physical and mental

4    harm and fear to the victim and her husband.

5         Finally, the Court has reviewed the sentences of

6    defendants in this district who are similarly situated, and

7    determined that they received prison sentences as well,

8    including one upward departure as here, so I've determined

9    that the sentence imposed here of 18 months does not result

10   in unwarranted disparities among defendants.

11        It also provides care and treatment for you,

12   Mr. Vang, and I'm glad to see that you have begun your path

13   of recovery.  I am glad to see the number of people you have

14   here in support of you, and I will say to them that you're

15   going to continue to need that support, both in prison and

16   while you are on supervised release, and so I'm hopeful that

17   they hear that and can continue to provide you with support

18   on recovery so that this never happens again.

19        That said, I'm going to now formally impose

20   sentence.  That will include your supervised release term

21   and the conditions of release.  It is as follows:

22        You will be committed to the custody of the Bureau

23   of Prisons for a period of 18 months.  I am going to

24   recommend any drug treatment that the Bureau of Prisons has

25   available to it in that time period, and I will recommend

1    that your incarceration be in Minnesota.  That is a

2    recommendation that I give, but after I pronounce sentence

3    and commit you to the custody of the Bureau of Prisons, it

4    is their ultimate determination, but I am making that

5    recommendation.

6            No fine is ordered.  I would prefer that you pay

7    any amount that comes out of any civil -- any civil case.

8            There is no restitution.  It has not been

9    requested.

10           On release from imprisonment, you'll be placed on

11   supervised release for a period of one year.  The following

12   mandatory conditions are applicable:

13           You shall not commit any crimes; federal, state,

14   or local.

15           You shall not illegally possess a controlled

16   substance and refrain from unlawful use of a controlled

17   substance.  You shall submit to one drug test within 15 days

18   of release from imprisonment, and at least two periodic drug

19   tests thereafter as determined by the Court.

20           You shall cooperate in the collection of DNA as

21   directed by the probation officer.

22           And you shall abide by the standard conditions of

23   supervised release in this district, including reporting to

24   the probation officers within 72 hours of your release from

25   imprisonment unless a probation officer instructs you

1    otherwise.

2              And you shall not own, possess, or have access to

3    any firearm, ammunition, destructive device, or any other

4    dangerous weapon.

5              I'm also imposing the following special conditions

6    during your term of supervised release:

7              You shall have no contact with the victim L.B. and

8    any member of L.B.'s family and L.B.'s address.  That

9    includes letters, communication devices, audio or visual

10   devices, visits, any contact through a third party without

11   prior consent of the probation officer.

12             You shall abstain from the use of alcohol and

13   other intoxicants and not frequent establishments whose

14   primary business is the sale of alcoholic beverages.  I find

15   that necessary and related to the condition of abstaining

16   from substance abuse.

17             You shall submit to substance abuse testing as

18   approved and directed by the probation officer and shall

19   participate in counseling or treatment program as approved

20   by the probation officer.  Again, I know that you've already

21   done that and intend to continue to do that, so my order is

22   simply -- it's an order, but it's intended to help you.

23   That's what supervised release is all about.  You shall

24   contribute to the costs of such treatment as determined by

25   the Probation Office, not to exceed the total cost of

1     treatment.

2            There is a $100 special assessment for the Crime

3     Victims Fund required to be paid immediately.

4            Mr. Vang, you have the right to appeal your

5     conviction.  If you believe that your guilty plea was

6     unlawful or invalid for any reason, you have the right to

7     appeal your sentence if you believe it was contrary to law.

8     If you wish to appeal your conviction, your sentence or

9     both, you must do so within 14 days after entry of judgment

10    of conviction in this case.  If you cannot afford to pay the

11    costs of an appeal, you may ask for permission to do so *in*

12    *forma pauperis*, or without paying any fees or costs.  And if

13    you make such a request, the clerk of court will file a

14    Notice of Appeal on your behalf.

15           The Presentence Investigation Report will be kept

16    in the Court's files under seal.  If you file an appeal, the

17    Presentence Investigation Report will be delivered to the

18    United States Court of Appeals for the Eighth Circuit.

19           In this case, the sentencing -- or the letters

20    related to sentencing and victim impact have been given as

21    testimony.  Does either party wish that this testimony be

22    under seal?

23           MR. NELSON:  Not from the Government, Your Honor.

24           THE COURT:  Mr. Lengeling?

25           MR. LENGELING:  No.  No.

1          THE COURT:  All right.  Then the transcript will

2     be not sealed.

3          Mr. Vang, you are currently on release.  You have

4     made a motion for voluntary surrender.  Does the Government

5     object to voluntary surrender in this case?

6          MR. NELSON:  Your Honor, probation is also

7     recommending voluntary surrender.  At this point the

8     Government has no evidence to contradict or to suggest that

9     the Defendant is likely to flee or pose a danger to the

10     community if continuing on release, therefore, I do not

11     object to a self-surrender date.  And I think it would be

12     reasonable for the Court to select a date sometime after the

13     holidays.

14          THE COURT:  One moment.  I will allow for

15     voluntary surrender on Wednesday, January 8th.

16          And I apologize.  I missed a special condition of

17     supervised release.  So in addition to the special

18     conditions of supervised release that I have already

19     pronounced, I am including a prohibition from engaging in

20     employment or service in the medical or pharmaceutical field

21     during the period of supervision.

22          So, Mr. Vang, you're ordered to surrender for

23     service of your sentence at the institution which will be

24     designated by the Bureau of Prisons by 2:00 on Wednesday,

25     January 8th, 2020, as notified by the Probation and Pretrial

1 Services Office.  In the event there's been no designation,

2 you would surrender to the United States Marshal, and

3 Mr. Lengeling can help you through that, as well as

4 probation.

5    Mr. Nelson, is there anything else for the

6 Government?

7    MR. NELSON:  No.  Thank you, Your Honor.

8    THE COURT:  Mr. Lengeling, anything else from the

9 defense?

10    MR. LENGELING:  I don't anticipate an appeal, but

11 just let the record reflect that we do have an objection to

12 the sentence, Your Honor.

13    THE COURT:  Understood.  Thank you.

14    From probation, is there anything further that the

15 Court needs to address?

16    THE PROBATION OFFICER:  No, Your Honor.  Thank

17 you.

18    THE COURT:  Thank you.  I appreciate you all being

19 here today.  I know you were all here for different and

20 varying reasons, and it is no small thing right before a

21 holiday to be here in support of a family or a defendant,

22 and I appreciate all of your presence here today.  Thank

23 you.  Court is adjourned.  Good luck, Mr. Vang.

24  (Court adjourned at 4:16 p.m.)

25       *     *     *

1

2

3          I, Erin D. Drost, certify that the foregoing is a

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7               Certified by:   *s/ Erin D. Drost*

8                               Erin D. Drost, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25