TRULINCS  21990041 - VANG, LA - Unit: RCH-B-A

-------------------------------------------------------------------------------

FROM: Unit Team 1
TO: 21990041
SUBJECT: RE:***Inmate to Staff Message***
DATE: 04/17/2020 02:52:03 PM

You do not meet the current criteria for the early Home Detention.

>>> ~^!"VANG, ~^!LA" <21990041@inmatemessage.com> 4/17/2020 12:01 PM >>>
To: To Whom it May Concern
Inmate Work Assignment: Kitchen

-----RIS Coordinator on 4/9/2020 7:42 AM wrote:

>
we will review your request.

>>> ~^!"VANG, ~^!LA" <21990041@inmatemessage.com> 4/8/2020 5:27 PM >>>
To: Ms. Pasky
Inmate Work Assignment: Kitchen

My name is La Vang. I am currently serving a 18 months sentence with an outdate of April 18, 2021 with home confinement I will be release Feb 18, 2021. I am a first time offender and serving a non-violent case and have done 3 months of my sentence. I was charge in Anoka County on August 3, 2018 and was on pretrial release until my sentence in federal court on November 2019. I self surrender here January 8, 2020.

I ask for compassionate release due to extra ordinary circumstances stemming from COVID-19 virus problems. I pose no threats to society. As previously stated, I have been on pretrial release for over a year with no troubles. I have been giving clean UA to both Anoka county for over a year and federal for 6 months. I have veritable re-entry plan, amazing work evaluation, and excellent work performance. I have completed outpatient treatment before self surrending here. I have enrolled myself in NRDAP and a keyboarding and nutritional class. I have no prior trouble while in here and outside of prison. I have a short sentence and home confinement present low risk for contracting COVID-19 rather than being in a BOP facilty. I am not a danger to communities, hence being granted pretrial release. I know my age do not qualify for compassionate release, but a short sentence, non-violent crime will decrease the chances of me contracting COVID-19 while being confine to my home.

I have no medical hold or detainers. Attorney William Barr stated, "although inmated reviewed a sentence for the crime they committed, they were never sentence to death." The corona virus is a deadly virus and has proven to kill people outside as well as inmated in both state and federal prisons. I would complete my time in home confinement because I was doing good on pretrial release for over a year as previously stated. I hope you consider my motion for compassionate release based on the Care Act , section 12003 (B)(2).

Thank you,
La Vang
21990-041



Page (3)
June 1, 2020

RULINCS 79118080 - PROO, JOE CRUZ - Unit: RCH-B-A

---

The 6th should act on the BOP's stay motion early this week.

Williams v. Wilson, Case No. 19A-1041, 2020 U.S. LEXIS 2951 (Supreme Court, May 26, 2020)

Cleveland Plain Dealer, National law enforcement leaders urge the release, transfer of inmates at federal prison in Ohio (May 28)
<><>

BAIT AND SWITCH?

The Dept. of Justice conducted a 10-month long study-and-comment period last year on developing a risk and need assessment, a process that resulted last January in the adoption of "PATTERN". Everyone was to be scored on the likelihood to re-offend after being released, with the scores placing each inmate in the minimum, low, medium or high category.

Using the revised PATTERN matrix adopted in January, I have helped several people estimate their PATTERN scores. In almost every case, when the people I helped received their PATTERN scores from the BOP, they were higher, sometimes much higher, and the reason for the discrepancy was a mystery.

ProPublica, an independent investigative journalism nonprofit, last week reported it had obtained a 20-page policy document drafted by the BOP earlier this year that secretly altered PATTERN standards to make "it harder for an inmate to qualify as minimum risk." The draft document dramatically changes the maximum number of points for each risk category, according to ProPublica. "It really tanks the whole enterprise if, once an instrument is selected, it can be strategically altered to make sure low-risk people don't get released," Brandon Garrett, a Duke University law professor who studies risk assessment, told ProPublica. "If you change the cut points, you've effectively changed the instrument."

ProPublica said a BOP spokesman confirmed to it that the Bureau had revised the risk categories without informing the public. The 2019 report was an "interim report," ProPublica quotes the spokesman as having said. "The interim report mentioned that DOJ would seek feedback and update the tool accordingly, which was done." The spokesman said the draft policy document "was not authorized for release."

Ohio State University law professor Doug Berman wrote in his Sentencing Policy and Law blog that the ProPublica report was "yet another ugly example of how the Department of Justice acts more like a Department of Incarceration."

The ProPublica report came a week after former Trump lawyer Michael Cohen was sent to home confinement after serving only a third of his sentence.. His release and that of former Trump campaign chairman Paul Manafort, a Marshall Project/NBC report said, are "raising questions about the BOP's opaque process and its fairness."

ProPublica reported that Senators Richard Durbin (D-Illinois) and Charles Grassley (R-Iowa), who were First Step Act co-authors, said last week the DOJ's inspector general has agreed to examine BOP's compliance with Barr's home confinement directive and overall response to the COVID-19 pandemic.

ProPublica, Bill Barr Promised to Release Prisoners Threatened by Coronavirus   Even as the Feds Secretly Made It Harder for Them to Get Out (May 26)
Sentencing Law and Policy, "Bill Barr Promised to Release Prisoners Threatened by Coronavirus   Even as the Feds Secretly Made It Harder for Them to Get Out (May 27)

The Marshall Project, Michael Cohen and Paul Manafort Got to Leave Federal Prison Due to COVID-19. They're The Exception (May 21)
<><>

WHACK-A-MOLE

The BOP, in the new "normal" for COVID-19, is playing "whack-a-mole" with fresh coronavirus outbreaks at facilities that had been COVID-19-free a few weeks ago, as well as increasing inmate illness at institutions that had seemed to be on the mend, The number of inmate COVID-19 cases last night (1,689) is close to the week before (1,614). But inmate deaths increased from 60 a week ago to 69, and ominously, the number of facilities with COVID-19 cases hit 56 last week, an all-time high.

Perhaps more ominous, an FCI Terminal Island inmate died last week after the BOP had earlier said the man had recovered

RULINCS 79118080 - PROO, JOE CRUZ - Unit: RCH-B-A       ③ June 1, 2020

om the illness. Adrian Solarzano tested positive for the virus on April 16 and was placed in isolation. The Los Angeles Times said the BOP deemed him "recovered" on May 10 after he no longer showed symptoms. But five days later on May 15 Solarzano was admitted to a hospital after complaining of chest pain and anxiety. He was tested twice for COVID-19, and authorities said both results were negative. But his condition worsened, and he was pronounced dead by hospital staff Sunday.

Meanwhile, the Anchorage Daily News reported that an Alaska man granted compassionate release from FCI Terminal Island, which still has 32 inmates and four staff ill, tested positive one day before his release. The BOP put him on a commercial flight to Anchorage, without ever telling him he had the virus.

The inmate's lawyer says a chain of misfires allowed the BOP to swab the inmate for testing on May 5, get positive-for-the-virus lab results on May 7, and release him to fly home commercially on May 8. "There are so many institutional failures you can identify in this," said Daniel Poulson, a federal public defender who represented the inmate on his compassionate release motion.

A class action lawsuit looking a lot like successful suits brought in Connecticut about FCI Danbury and Ohio on FCI Elkton was filed last Tuesday on behalf of the inmates at the several prisons that are part of the Butner, North Carolina, complex. The suit was brought by prisoners represented by the American Civil Liberties Union, the ACLU of North Carolina, the Washington Lawyers' Committee for Civil Rights and Urban Affairs, and the law firm of Winston & Strawn.

The suit, which seeks an injunction ordering Butner to release or transfer vulnerable prisoners, alleges that Butner officials have not taken the necessary steps to address the risk faced by the people in their custody. They have opposed motions for compassionate release, and they have failed to order furloughs or transfers to home confinement with sufficient speed and in sufficient numbers. They have failed to make other arrangements within the facility to allow for adequate physical distancing. And they have failed to implement effective isolation, quarantine, testing, screening, hygiene, and disinfecting policies or meaningfully modify movement protocols for staff and incarcerated people."

The Intercept reported last week that while the BOP's COVID-19 numbers include 230 halfway house residents, it "is clear is that the real number of residents with COVID-19 in federal halfway houses is higher than what appears on the BOP website." The Crime Report reported that because some halfway houses receive a per diem rate based on the daily population, the contractors "have an incentive to keep halfway houses as full as possible. Critics blame such financial incentives for a reluctance to send more people home during the pandemic."

The Intercept, As Coronavirus Spreads in Federal Prisons, Cases in Halfway Houses are Being Undercounted (May 28)

The Crime Report, Halfway Houses Called Another Vector for Coronavirus (May 28)

Anchorage Daily News, He tested positive for the coronavirus. One day later, a federal prison flew him home to Alaska (May 26)

Huff Post, Inside A Federal Prison With A Deadly COVID-19 Outbreak, Compromised Men Beg For Help (May 26)

Hallanan v Scarantino, Case No. 20HC2088 (EDNC, filed May 26, 2020)
<><>

JUNE 24 IS A HARD DATE FOR DAVIS CLAIMS

Just a reminder: The Supreme Court handed down US v Davis on June 24, 2019. Under 28 USC 2255(f)(3), anyone seeking to take advantage of the holding, which extended the categorical approach and the Johnson v US analysis to 924(c) convictions, has until June 24, 2020, to file a 2255 raising Davis issues.

If you have already had one 2255 motion decided on the merits, you you must file a 28 USC 2244 application with the Court of Appeals for permission to file a second-or-successive 2255. Filing a 2244 (which should have your proposed Davis 2255 motion attached) would have to be submitted by the June 24 deadline.

If any of this is unclear, you should contact your favorite legal professional. If Davis might apply to your case, June 24 is a hard date, and those who miss it will find the courts pretty unforgiving.

US v Davis, --- US ---, 139 S. Ct. 2319, 204 L. Ed. 2d 757 (Supreme Court, June 24, 2019)
<><>

RULINCS  79118080 - PROO, JOE CRUZ - Unit: RCH-B-A

FROM: Newsletter, Lisa
TO: 79118080
SUBJECT: Supreme Court Slaps Down BOP on Stay in FCI Elkton Habeas   LISA Newsletter for June 1, 2020
DATE: 05/31/2020 10:06:22 PM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, M.A.., J.D.

Vol. 6, No. 22

But Wait, There's More!
PATTERN Bait and Switch?
Whack-A-Mole
Davis Time Running Out
:><:>

BUT WAIT, THERE'S MORE!

More in the continuing saga of FCI Elkton and the pandemic  in which a Cleveland-based Federal Judge issued a preliminary injunction against the Bureau of Prisons facility because the conditions of confinement of inmates especially vulnerable to COVID-19 was likely to constitute "deliberate indifference" (a term loaded with 8th Amendment implications).

I reported last week that the BOP had run to the Supreme Court to ask for a stay of the district court's injunction. Last Tuesday, the Supremes voted 6-3 to deny the BOP's stay request.

Last month, US District Court Judge James Gwin granted a preliminary injunction ordering FCI Elkton to identify, and then to start transferring or releasing to home confinement medically vulnerable prisoners. The BOP promptly asked the 6th Circuit to stay the injunction, but the 6th refused.

But despite the injunction, the BOP slow-walked the identification and transfer of vulnerable inmates. Two weeks ago, the District Court ordered the BOP to loosen requirements on who qualifies for CARES Act home confinement, or to explain in detail to the court why it denied a vulnerable inmate either CARES Act placement, compassionate release, a furlough or transfer.

After the May 19 court order spelling out what Elkton was to do right away, the BOP asked the Supreme Court to stay the preliminary injunction pending appeal of the injunction to the 6th Circuit "and, if the court of appeals affirms the injunction, pending the filing and disposition of a petition for a writ of certiorari and any further proceedings in this Court."

The problem with the BOP's Supreme Court filing was evident from the get-go. Although it claimed to want a stay of the April injunction, the BOP spent much of its brief complaining about the May 19 order. As the inmate plaintiffs cheerfully pointed out in their response, the BOP had never asked the 6th Circuit to review last week's order, and jumping the appeals court to straight to SCOTUS is not allowed.

Last Tuesday, the Supremes agreed (with a caveat):

"[O]n May 19, the District Court issued a new order enforcing the preliminary injunction and imposing additional measures. The Government has not sought review of or a stay of the May 19 order in the U.S. Court of Appeals for the Sixth Circuit. Particularly in light of that procedural posture, the Court declines to stay the District Court's April 22 preliminary injunction without prejudice to the Government seeking a new stay if circumstances warrant."

The Court seemed to be leaving the door open a crack, inviting the BOP to come back if it cannot get the 6th Circuit to stay the latest order. If that was the message, it worked. On Thursday, the BOP filed another "emergency" request for stay of the injunction with the 6th Circuit. The inmate plaintiffs filed their opposition on Saturday.

Meanwhile, a brief filed in the case last Thursday by a coalition of current and former prosecutors, police chiefs and attorneys general urged the appellate court to back Judge Gwin's injunction. "The threat posed by the spread of the virus requires an immediate and significant reduction in jail and prison populations by prioritizing public health and ordering the swift release of every person who can safely return to the community," the brief said.

*may 25, 2020*

*On Page 1*

TRULINCS 79118080 - PROO, JOE CRUZ - Unit: RCH-B-A

---

FROM: Newsletter, Lisa
TO: 79118080
SUBJECT: Supreme Court to Decide Whether to Give BOP Stay on Elkton Fix   LISA Newsletter for May 25, 2020
DATE: 05/24/2020 10:06:15 PM

LISA publishes a free newsletter sent every Monday to inmate subscribers in the Federal system.

Edited by Thomas L. Root, M.A.., J.D.

Vol. 6, No. 21

BOP Asks Supreme Court to Stop Federal Judge's Elkton Injunction
Time for Phase Seven
Media, Advocacy Groups Call Out BOP 'Cruel Indifference"
6th Circuit Issues Remarkable Crack Sentence Reduction Ruling
<><>

BOP ASKS SUPREME COURT TO STOP FEDERAL JUDGE'S ELKTON INJUNCTION

The Supreme Court will decide this week whether to grant the BOP a stay of enforcement of a federal court order that it drop a number of requirements for CARES Act home confinement.

In April, the US District Court for the Northern District of Ohio granted a preliminary injunction ordering BOP officials at FCI Elkton to identify and start transferring or releasing to home confinement prisoners who had risk factors making them particularly susceptible to COVID-19. The BOP appealed the injunction to the 6th Circuit, which denied the BOP in an order finding no abuse of discretion.

After losing a few weeks ago, the BOP allegedly did not do much to comply. Last Tuesday, Judge Gwin found that "[b]y thumbing their nose at their authority to authorize home confinement, [Elkton BOP officials] threaten staff and they threaten low security inmates."

Of 837 inmates identified as medically vulnerable, the BOP had "made only minimal effort to get at-risk inmates out of harm's way" the Judge wrote. "As of May 8, 2020, five lawsuit class members were awaiting transfer to home confinement, and only six other had been identified as maybe qualifying for home confinement."

Judge Gwin ordered the BOP to loosen requirements at Elkton on who qualifies for placement on home confinement under the Bureau's CARES Act authority by

  eliminating requirements on length of sentence an inmate has served (reversing the 50% sentence requirement in order to be eligible);

  disregarding whether the inmate had gotten any lower level shots in the last year;

  eliminating the requirement that an inmate be a US citizen to get home confinement;

  letting inmates with "low" PATTERN risk score be placed on CARES Act home confinement; and

  disregarding the fact that an inmate is serving time for a "violent" crime if the crime occurred more than five years ago.

Last Wednesday, the BOP asked the Supreme Court to stay the preliminary injunction pending appeal to the US Court of Appeals for the 6th Circuit and to the Supreme Court if necessary. The BOP said it was "working assiduously to mitigate those risks within its facilities by implementing a multi-phase plan it developed in January 2020," and complained that "the district court's injunction -- now augmented by the court's sweeping May 19 order -- would undermine BOP's systemic response to the COVID-19 pandemic; intrude the Judicial Branch on policy decisions that have been assigned to expert prison administrators; and require BOP to defy the CDC's guidance to restrict prisoner movements during the pandemic to avoid unnecessary risk of spreading the virus."

On Friday morning, the inmate petitioners   represented by the Ohio ACLU   responded, telling the Supreme Court that BOP Elkton staff "have made limited efforts to reduce the COVID-19 risks within the prison." Nearly 80% of the population has not

TRULINCS 79118080 - PROO, JOE CRUZ - Unit: RCH-B-A

---

been tested. Of 524 tests run, the prison only has results for 230, with 55 prisoners 24% - testing positive. Elkton is running tests only on Mondays and Tuesdays.

Also on Friday, three physicians expert in correctional health filed a brief in the case supporting the inmate petitioners, telling the court that vulnerable inmates at Elkton "are at high risk of serious, life-threatening COVID-19 infection, and that their continued confinement puts them at a heightened risk of contracting and further spreading COVID-19."

A Supreme Court decision could come as early as Tuesday.

Order, Dkt. 85, Wilson v. Williams, Case No. 4:20cv00794 (N.D. Ohio, issued May 19, 2020)

Application for a Stay of the Injunction Issued by the United States District Court for the Northern District of Ohio and for an Administrative Stay, Williams v. Wilson, Case No. 19A-1041 (Supreme Court, May 20, 2o20)

Opposition to Application for a Stay of the Injunction Issued by the United States District Court for the Northern District Of Ohio and for an Administrative Stay, Williams v. Wilson, Case No. 19A-1041 (Supreme Court, May 20, 2020)

Motion for Leave to File Brief as Amicus Curiae and Brief for Public Health Experts as Amicus Curiae Supporting Respondents, Williams v. Wilson, Case No. 19A-1041 (Supreme Court, May 22, 2020)
<><>

TIME FOR PHASE SEVEN

The BOP launched Phase Seven of its COVID-19 Action Plan last week, announcing that it will begin moving about 6,800 inmates who have been waiting in local detention centers across the US to federal prisons to avoid further jail overcrowding.

The BOP will set up three designated testing and quarantine sites, FTC Oklahoma City, FCC Yazoo City and FCC Victorville. The transferees will be tested for COVID-19 when they arrive at the quarantine site facility and again when they are transferred to their designation institution.

No plans have been announced for mass testing of current BOP inmates, although groups as diverse as the ACLU and the Council of Prison Locals (representing 30,000 BOP employees) have called for universal testing in all prisons.

The number of inmate COVID-19 cases reported by the BOP dropped throughout the past week from 2,402 to 1,606, but the staff COVID-19 case numbers have are only slightly down, from 196 to 186. The number of institutions with active COVID-19 cases remains at 52. Three more inmates died this week, bringing the total dead to 60.. At least two facilities that had once reported COVID-19 but were later declared to be virus-free are back on the list: FCI Talladega reports one inmate and one staff member with the illness, and FMC Devens - with no cases just two weeks ago now reports 24 inmates and two staff sick with the virus.

The problem with the BOP numbers is that no one really believes them. Reuters reported last week that while a May 6 CDC report that surveyed local, state and federal prisons for COVID-19 reported 5,000 inmate cases. Reuters performed its own data analysis, and found about 17,300, over three times CDC's tally.

The infectious disease experts who filed the Supreme Court amicus brief in the FCI Elkton case noted that "over 3,000 confirmed cases of coronavirus have emerged in BOP's federal correctional facilities. Given the dearth of testing, these numbers likely dramatically understate the problem."

Finally, in the wake of the Oakdale COVID-19 disaster, USA Today reports, the BOP has reassigned Oakdale warden Rodney Myers to "temporary duty" at the BOP South Central Regional Office. USA Today said neither the BOP nor Myers responded to requests for comment.

Reuters, Across U.S., COVID-19 takes a hidden toll behind bars (May 18)

USA Today, Feds reassign warden at Louisiana prison hit hard by coronavirus (May 22)

KDBC-TV, El Paso, Texas, Federal prison system to begin moving nearly 7K inmates (May 22)

Detroit News, Chance of an early release for Kilpatrick raises questions, we've got answers (May 24)

TRULINCS 79118080 - PROO, JOE CRUZ - Unit: RCH-B-A

--------------------------------------------------------------------------------

<><>

MEDIA, ADVOCACY GROUPS CALL OUT BOP 'CRUEL INDIFFERENCE"

Word that the BOP was sending Michael Cohen, President Trump's former lawyer, from FCI Otisville to home confinement under the CARES Act has sparked widespread criticism of the BOP's management of the home detention program.

Cohen, serving a 36-month sentence, has not yet served half of his term. However, while the BOP has been closed-mouth about the release, it appears that as of May 22, he had served 25% and was within 18 months of his good-time release. Cohen was originally slated to go home last month, but he was pulled from the list because he had not met the BOP's newly-ginned up minimum sentence requirements.

The Washington Post complained last Friday that the "disorganization" at the Bureau of Prisons has not been limited to Cohen. "Inmates in several institutions have complained that the agency has issued shifting, sometimes contradictory directives about who should be released, and applied the rules inconsistently  The bureau's decisions on who gets out, though, have sparked considerable controversy. That was especially true for [one-time Trump campaign chairman Paul] Manafort, who had been imprisoned since 2018 and was serving a term of more than seven years."

Last week in Newsweek, a public defender and prison advocate wrote that "[w]e aren't angry that Manafort will serve the remainder of his sentence from the comfort of his three-bedroom home in Northern Virginia with his family.. Far from it: We are outraged that the exact same reasonable argument and urgent call for release made by the millions of other people caged in jails and prisons across the country with the support of their families, public defenders, advocates, organizers and medical professionals have been met with cruel indifference or derision by those with the power to do something."

In a Massachusetts case heard last week, according to Law360, FMC Devens' warden testified that an inmate seeking compassionate release had served less than half his sentence, and thus was not considered for CARES Act release. "As the warden was testifying," the judge said later, "the Bureau of Prisons evidently ordered an exception to this requirement for President Trump's former campaign manager Paul Manafort even though he had only served 23 months of a 77-month sentence. Every person and case is unique, and Mr. Manafort may have health problems that place him at a particularly high risk. However, making an exception to the policy for him and refusing to consider  and other elderly inmates on the merits will raise reasonable questions about whether justice is indeed blind."

Since the CARES Act passed at the end of March, the number of people in home confinement has increased by only 2,578, about 1.5% of the nearly 171,000 people in federal prisons and halfway houses when the Act passed.

The latest high-profile release, at least in Detroit, is this past weekend's rumor that former mayor Kwame Kilpatrick will be send by the BOP to home detention for his remaining 17 years. The widely-reported but unconfirmed release would release Kilpatrick after fewer than seven years served.

==Many prisoners are excluded from the home detention program by the BOP's restrictive view of what constitutes a prior crime of violence and PATTERN risk assessment scores that aren't "minimum." Some of those prisoners are turning to compassionate release motions under 18 USC 3582(c)(1)(A). Since Trump signed the First Step Act in December 2018, only 144 people had been granted such release through April 1st. Since then, 268 prisoners nationwide received compassionate release.==

The Dept of Justice has been reflexively fighting compassionate release motions. In a case decided last week, government lawyers called compassionate release a "Get Out of Jail Free Card" and referred to the pandemic as "a red herring." DOJ contends that compassionate release is just judges micromanaging prisons, that the BOP knows best whom to release, and that the BOP's COVID-19 Action Plan has controlled the pandemic and makes prison a safer place to be than at home.

The Marshall Project, Michael Cohen and Paul Manafort Got to Leave Federal Prison Due to COVID-19. They're The Exception (May 21)

The Washington Post, Michael Cohen released from federal prison over coronavirus concerns (May 21)

Newsweek, We're Not Angry Paul Manafort Was Released. We're Angry Millions of Others Weren't (May 18)

Law360.com Manafort's Release Helps Spring Ex-NFL Lineman From Prison (May 15)

Detroit Free Press, COVID-19 outbreak that killed his fellow inmates will help set Kwame Kilpatrick free (May 22)