UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 19-97 (NB)

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(1)(A)** |
| v. | |
| LA VANG, | |
| Defendant. | |

Defendant La Vang has filed a motion asking this Court to reduce his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A) and order his immediate release, relying on the threat posed by the COVID-19 pandemic. The United States respectfully opposes the motion. This Court should deny the motion with prejudice because defendant has not met his burden of establishing that a sentence reduction is warranted under the statute. This Court should also deny defendant's alternative request for an order directing BOP to transfer him to home confinement.

**Factual Background**

Defendant pleaded guilty to Count 1 of the Indictment, which charged him with obtaining controlled substances by fraud in violation of 21 U.S.C. § 843(a)(1) and (d)(1). The PSR calculated a total offense level of 10, with a criminal history category I, resulting in an advisory Guidelines range of 6-12 months' imprisonment. (PSR ¶¶ 34-37, 43, 86). This Court, however, granted the government's motion for an upward variance and sentenced defendant to 18 months of imprisonment. Defendant has served approximately 6 months of that sentence. He now moves under 18 U.S.C. § 3582(c)(1)(A) for a sentence reduction resulting in his immediate release from the custody of the Bureau of Prisons (BOP), relying solely on the threat posed by the COVID-19 pandemic.

## I.   BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a multi-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

BOP's operations are presently governed by Phase Seven of the Action Plan. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible,

to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended at this time, to limit the number of people entering the facility and interacting with inmates. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Congress has also acted to enhance BOP's flexibility to respond to the pandemic. Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP. Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note). On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. As of this filing, BOP has transferred 4,619 inmates to home confinement, which is an increase of 162% since March 2020. *See* Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, *at* https://www.bop.gov/coronavirus/.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

## II.   Defendant's Conviction and Request for a Sentence Reduction

Defendant is a former home health care nurse. His conviction arises from his fraudulent procurement of pain medication belonging to one of his patients, L.B. At the time of the offense, L.B. was an 84-year old woman suffering from rheumatoid arthritis, congestive heart failure, was a breast cancer survivor, and had several joint replacements. (PSR ¶ 7). L.B. had ankle surgery in November 2017 and developed a blood infection that required a second surgery in February 2018. (PSR ¶ 7). Her doctors prescribed her various medication to help her recover from her surgeries, including potent narcotic pain relievers: oxycontin (10 mg twice per day) and oxycodone for breakthrough pain (5 mg as needed up to twice per day). (PSR ¶ 8).

Following the second surgery, Medicare authorized in-home health services for L.B., which were provided by a company called LifeSprk. (PSR ¶ 7). LifeSprk assigned someone to L.B., and while under that person's care L.B.'s pain levels were under control, she could function, and was coherent. (PSR ¶ 7). Beginning in April 2018, however, LifeSprk assigned defendant, a registered nurse, to take over responsibility for L.B.'s care.

5

(PSR ¶ 8). Among defendant's duties while caring for L.B. was setting up her weekly medication planner with her prescribed medications, including the oxycodone and oxycontin. (PSR ¶ 9). Defendant was also authorized to pick up L.B.'s medications from the pharmacy, and was aware when her refills were available. (PSR ¶ 9).

After just a couple visits under defendant's care, L.B. suffered a pronounced decrease in her health and ability to function. (PSR ¶ 8). L.B. was in pain all over her body, she could not sleep well, and she was lethargic, incoherent, and had no appetite. (PSR ¶¶ 8, 23). L.B.'s primary care physician also began questioning L.B. and her husband about improper use of controlled substances and raising concerns over L.B.'s prescriptions being filled at multiple pharmacies. (PSR ¶¶ 10, 23). The physician refused to prescribe L.B. any more narcotics and referred her to North Memorial's Pain Clinic. (PSR ¶ 10).

During her course of treatment at the pain clinic, L.B. provided multiple blood and urine samples, which tested negative for the presence of opiates even though L.B. had been taking what she and her family believed to her prescribed medication. (PSR ¶ 11). In approximately July 2018, L.B.'s husband contacted LifeSprk to raise concerns about the negative opiate tests, and only then learned for the first time that: (1) LifeSprk records showed that the period of care provided by the company ended on May 1, 2018, and (2) defendant was no longer employed by LifeSprk even though he had continued to visit L.B. under the auspices of being a LifeSprk employee. (PSR ¶ 12; ECF 29 ¶ 2). L.B.'s family contacted the police. (PSR ¶ 12). Police searched L.B.'s house and found an oxycodone bottle that did not contain oxycodone as the family believed, but rather contained similar-looking loratadine (Claritin) allergy tablets. (PSR ¶ 13).

On August 2, 2018, during defendant's next planned visit to L.B.'s home, police conducted a controlled "sting" operation in which they observed and documented L.B.'s narcotic medication (now hydrocodone instead of oxycodone) both before and after defendant's visit to the home. (PSR ¶ 15). The operation revealed that, when defendant visited the home, he covertly put similar-looking acetaminophen (Tylenol) tablets into

6

L.B.'s medication planner instead of hydrocodone. (PSR ¶ 16). Police conducted a traffic stop on defendant as he left the home and found numerous hydrocodone tablets defendant had fraudulently stolen from L.B. (PSR ¶ 15). Police also found in defendant's car several empty oxycodone bottles in L.B.'s name dated from April to June 2018 as well as empty bottles of acetaminophen and loratadine. (PSR ¶ 15).

In discussions with police officers, defendant initially falsely reported that he was working for Lifesprk. (PSR ¶ 15). Ultimately, however, defendant admitted to stealing the narcotics from L.B. on multiple occasions and replacing them with substitute tablets. (PSR ¶ 18). A subsequent investigation into defendant also revealed that he was the subject of multiple complaints during his previous employment at other health care companies, which included complaints related to missing medication, and showing up at patients' homes to set up medication after he had been terminated. (PSR ¶ 38).

Although the defendant has a negligible criminal history prior to the instant offense, the Court agreed with the government that a sentence of 18 months—6 months above the top of the Guidelines range—was necessary provide just punishment for the offense, to provide adequate deterrence, and to protect the public from further crimes by the defendant. (ECF 50 p. 3).

According to BOP records, defendant reported to prison on January 8, 2020. He is currently incarcerated at the FMC Rochester in Minnesota. He had only five days of jail credit related to the offense, and thus he has served approximately 6 months of his 18 month sentence.

While incarcerated, defendant requested from the BOP a reduction in sentence based on his concerns about the COVID-19 pandemic. According to an exhibit provided with defendant's motion, he also requested early home confinement. Both requests were denied. (See Govt. Ex. 1; Def. Exhibit, ECF 55).

On June 8, 2020, defendant filed a motion with this Court seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A) on the ground that, in the BOP, "[a]nyone can

7

contract the [corona]virus and die." (ECF 54 p. 1). He also argues that he has a short sentence and has done well while incarcerated. (*Id.* pp. 1-2).

**Legal Framework**

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided

in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[1]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

---

[1] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

9

**Arguments**

I. **This Court Should Deny the Motion With Prejudice Because Defendant Has Failed to Present Any "Extraordinary and Compelling Reasons" Warranting a Sentence Reduction and Because He Poses a Danger to Public Safety if Released.**

This Court should deny defendant's motion for a reduction in his sentence with prejudice on either of two independently sufficient grounds. First, Defendant has not established that "extraordinary and compelling reasons" support a sentence reduction within the meaning of § 3582(c)(1)(A) and the Sentencing Commission's policy statement. Second, defendant has not met his burden to show that a reduction is warranted in light of the danger that defendant would pose to the community and the relevant § 3553(a) factors. In addition, this Court lacks statutory authority to grant defendant's alternative request to direct BOP to transfer him to home confinement.

    A. **Defendant Has Not Identified "Extraordinary and Compelling Reasons" for a Sentence Reduction.**

Defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release. As explained above, under the relevant provision of § 3582(c), a court can grant a sentence reduction only if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i); *see also United States v. Bellamy*, 2019 WL 3340699 (D. Minn. July 25, 2019). The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. USSG § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, a defendant first must establish that his condition falls within one of the categories listed in the policy statement. Those categories include, as particularly relevant here, (i) any terminal illness, and (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the

10

environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, cmt. n.1(A). If a defendant's medical condition does not fall within one of the categories specified in the application note (and no other part of the application note applies), his or her motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, does not fall into either of those categories and therefore could not alone provide a basis for a sentence reduction. *See United States v. Fry*, 2020 WL 1923218 at *1 (D. Minn. Apr. 21, 2020) ("To merit such compassionate release, Fry must show more than a mere speculation of the possibility of contracting the virus."). The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *see also United States v. Eberhart*, 2020 WL 1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[2] To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-

---

[2] *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Here, defendant has neither alleged—nor provided any documentation—that he suffers from a medical condition that falls within one of the categories specified in the policy statement's application note. The undersigned has also reviewed defendant's medical records from the Bureau of Prisons as well as the presentence report and has not identified any medical condition referenced in those records that would arguably qualify him for compassionate release. Indeed, the only physical condition referenced in the PSR is a sports-related injury to defendant's back and shoulder. (PSR ¶ 56). Similarly, defendant cites no reason to believe that he is at increased risk of contracting COVID-19, or that he falls within a category of people who are at high risk of death or complications should he contract the virus. Finally, as of the time of this writing, there are no confirmed cases of coronavirus at defendant's place of incarceration, FMC Rochester. *See* https://www.bop.gov/coronavirus/. In short, defendant's motion is based on a speculative, generalized concern related to the COVID-19 pandemic. Because defendant's bare concern about COVID-19, unsupported by individualized facts, cannot establish an "extraordinary and compelling reason" for a sentence reduction under § 3582(c), the motion should be denied.

### B. Defendant Still Poses a Significant Danger to the Safety of the Community

Defendant's request for a sentence reduction should also be denied because he has failed to demonstrate that he is not a danger to the safety of the community. At the present time, it is apparent that, but for the COVID-19 pandemic, defendant would present no basis for compassionate release. He has no apparent medical ailments other than a shoulder/back

injury and that injury does not present any impediment to his ability to provide self-care in the institution. At present, defendant is incarcerated in FMC Rochester, which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, and would also act to treat any inmate who does contract COVID-19.

Moreover, this Court must consider all pertinent circumstances, including danger to the community should Defendant be released. Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a) factors, as "applicable," as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020); *United States v. Hahn*, 2020 WL 980185 at *3 (D. Minn. Feb 28, 2020).

Defendant would pose a danger to public safety if released and thus the Court should deny a sentence reduction on that basis alone. Defendant's offense involved him fraudulently taking painkillers from an extremely vulnerable person under his care. The defendant apparently engaged in the offense in order to fuel his own opiate addiction, which (by his own admission) was severe. Defendant's last legitimate opiate prescription was in 2015, and he had been feeding his addiction for approximately three years by obtaining opioids through illegitimate means, beginning with stealing medication from his own mother. (PSR ¶ 26). The scope of his addiction escalated over time, such that (at the time of his arrest) defendant was consuming up to 28 opiate pain pills a day. (*Id.*). These facts, combined with the other complaints against defendant related to missing medication, strongly suggest that defendant had engaged in similar conduct with other patients under his charge. While defendant may have made some strides in addressing his addiction since committing the present offense, the severity of his addiction and his willingness to harm others in order to feed it, means that he would present a risk to the public once released from a controlled, custodial setting.

### C. The § 3553(A) Factors Strongly Weigh Against His Release.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. Indeed, just over seven months ago, at defendant's sentencing, this Court found the § 3553(a) factors to be so aggravating that they warranted an upward variance from the advisory Guidelines range.

As noted in the government's sentencing memo, the nature of defendant's offense is extremely serious. First, the defendant did not merely obtain potent pain killers to which he was not entitled, but that he obtained them by taking them directly out of the hands of another human being who acutely needed them. This meant that defendant's pursuit of his own self-interest led directly to another person's suffering. Second, defendant did not merely steal the pills from someone who needed them, he covered up his theft using subterfuge by replacing the pills with over-the-counter Tylenol or allergy medication. This allowed defendant to continue depriving L.B. of her needed medication for *months* without being detected, and left L.B. and her family in search of answers as to why her health and overall condition had so precipitously declined.

The offense conduct is also particularly egregious because, in committing the crime, defendant exploited a tremendous power imbalance between L.B. (a particularly vulnerable victim) and himself (occupying a position of trust). With respect to the victim, L.B. was 84 years old when she was under the defendant's care, but it was not merely her age that made her vulnerable. L.B. suffered from serious health conditions including rheumatoid arthritis, congestive heart failure, and multiple joint replacements. She was in defendant's care because she had recently undergone surgery, experienced severe complications, and then undergone a second surgery. Her physicians had prescribed her palliative medication to cope with the after-effects of her surgeries, and her home healthcare providers were responsible to help mete out that medication. While she was actually taking her real pain medication, she was functioning well and "coherent." But once defendant began covertly

replacing her pain pills with counterfeit tablets, she was in pain, lethargic, and incoherent—making her all the more dependent on (and vulnerable to) defendant.

Defendant, in contrast, occupied a position (as L.B.'s nurse) in which L.B. and her family put great trust in him. Because of his role as a nurse, L.B. and her family had every reason to expect that defendant would act in L.B.'s best interests and look out for her health and well-being. As part of that trust, L.B. and her family gave defendant access to their home, entrusted him to set up her medications, and even authorized him to receive notice when L.B.'s prescriptions were available and pick them up from the pharmacy. L.B. and her family also entrusted defendant to return to the home outside of his normal visits on a couple of occasions based solely on defendant's representation that he had "erred in L.B.'s medication setup." (PSR ¶ 9). Instead of acting in L.B.'s best interests, however, defendant used his position of trust to serve his own interests, even knowing that meant harming the person in his case.

The end result of defendant's conduct was that L.B. suffered unnecessarily for months. As indicated in the PSR, she experienced pain all over her body and could not sleep well. She had to undergo multiple medical appointments to try to discover and manage the problem, at which she and her family were subjected to suspicion as to whether they were diverting the controlled substances. (PSR ¶¶ 10, 23). The PSR also discusses that L.B. unknowingly taking loratadine (Claritin) instead of her prescribed pills in her medication regimen could cause sedation, putting her at a higher risk of falls that are extremely dangerous to an elderly patient. (PSR ¶ 23). L.B. and her family rightfully feel "deeply affected" as a result of the defendant's conduct. (PSR ¶ 22).[3]

---

[3] L.B.'s family has provided the United States Attorney's Office with numerous letters expressing opposition to defendant's motion for compassionate release. Those letters are attached as exhibits to this response. Members of the family have also started an online petition opposing defendant's motion. The online petition can be found here: https://www.change.org/p/nathan-nelson-say-no-to-home-care-nurse-request-for-early-compassionate-release-from-federal-prison

15

Although there are undoubtedly mitigating aspects of the defendant's history and characteristics—including his own substance abuse issues and difficult childhood—those factors do not outweigh the appalling nature of the offense. Likewise, as discussed above, the severe nature of defendant's substance abuse problem make him a risk for victimizing others should he be released from prison. For these reasons, the § 3553(a) factors do not weigh in favor of defendant's early release. *See United States v. Rodd*, 2019 WL 5623973, at *4 (D. Minn. Oct. 31, 2019) (denial based on nature of criminal conduct).

Accordingly, in light of Defendant's record and the totality of relevant circumstances, this Court should deny the motion for a sentence reduction.

## II. This Court Has No Authority to Direct the BOP to Place Defendant in Home Confinement.

Defendant also seems to ask in the alternative that this Court order BOP to place him in home confinement. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (per curiam); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993); *See United States v. James*, 2020 WL 1922568 at *2 (D. Minn. Apr. 21, 2020); *United States v. Brown*, 2020 WL 1922567 at *2 (D. Minn. Apr. 21, 2020); *United States v. Kluge*, 2020 WL 209287 at *3 (D. Minn. Jan. 14, 2020). Because Defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

16

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (per curiam). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But defendant's request to serve the rest of his term in home confinement, as opposed to prison, works no reduction to his sentence. Home confinement merely permits the inmate to serve out his term of imprisonment at home. Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because defendant offers no other statutory authority to support his request for such relief, this Court has no authority to act on his request for such relief in this forum.[4]

---

[4] If a court grants a sentence reduction, it may "impose a term of . . . supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment." § 3582(c)(1)(A). In imposing a term of supervised release, the court may impose a period of home confinement as a condition of supervised release, provided that the court finds that home confinement is a "substitute for imprisonment." USSG § 5F1.2; *see* 18 U.S.C. § 3583(d). Alternatively, a court may consider modifying an existing term of supervised release to add a period of home confinement, consistent with USSG § 5F1.2. *See* § 3583(e)(2).

17

## Conclusion

For these reasons, this Court should deny Defendant's motion for a sentence reduction without prejudice for failure to exhaust administrative remedies or, in the alternative, deny the motion on the merits.

Respectfully submitted,

ERICA H. MacDONALD
United States Attorney

*/s/ Nathan H. Nelson*

BY: NATHAN H. NELSON
Assistant U.S. Attorney
Attorney ID No. 0388713

## CERTIFICATE OF SERVICE

I certify that a participant in the case is not CM/ECF user. I have mailed the document and it's attachments by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

La Vang, 21990-041
FMC Rochester
P.O. Box 4000
Rochester, MN 55903

*s/Nathan H. Nelson*
BY: NATHAN H. NELSON